GEORGE H. EVANS *et al.* v. TIMOTHY MCCARTHY, *as Auditor of State.*

STATE HOUSE—*Construction—Debt Due Contractors—Duty of Auditor.*
It is the duty of the state auditor to issue his warrant upon the state treasurer to pay a debt due to the contractors for work done by them in the construction of the state house, where it is admitted that everything is regular, and legal, and valid, and that a sufficient fund has been provided for by statute, known as the "state-house fund," with which to pay such debt, and where the warrant should be issued except for the reason that for the time being there is no money in the state treasury belonging to the aforesaid state-house fund with which to pay such warrant if it were issued.

*Original Proceeding in Mandamus.*

PETITION filed in this court on October 10, 1889. Answer to alternative writ filed on October 22, following. The plaintiffs, George H. Evans, J. J. Cox, and J. A. McCall, partners as *Geo. H. Evans & Co.,* prayed that a writ of *mandamus* issue from this court commanding that the defendant *Timothy McCarthy,* as auditor of the state of Kansas, issue his warrants upon the state treasurer for the amounts named in certain vouchers presented by them to the defendant, or show cause, etc. The opinion herein, filed at the session of the court in November, 1889, states the material facts.

*S. B. Bradford,* for plaintiffs.

*L. B. Kellogg,* attorney general, for defendant.

The opinion of the court was delivered by

VALENTINE, J.: The only question presented to this court in this case is, whether it is the duty of the state auditor to issue his warrant upon the state treasurer to pay a debt due to the contractors for work done by them in the construction of the state house, where it is admitted that everything is regular, and legal, and valid, and that a sufficient fund has been provided for by statute, known as the "state-house fund," with which to pay such debt, and where the warrant should be issued except for the reason that for the time being there

is no money in the state treasury belonging to the aforesaid state-house fund with which to pay such warrant if it were issued.

In the year 1879, and since, at every regular session of the legislature, taxes have been levied for the purpose of creating a state-house fund, to be used under the direction of a board designated as "the board of state-house commissioners" for the purpose, first, of building the west wing of the state house, second, of repairing the east wing thereof; third, of erecting the central portion thereof; and, fourth, of making such repairs as might from time to time become necessary. The principal question, however, to be considered in this case, is with reference to the true construction and interpretation of the act of 1889 levying taxes and creating a fund and making appropriations of the same for the construction of the central portion of the state house, and for making repairs of the wings thereof. (Laws of 1889, ch. 51.) The act provides for levying for each of the years 1889 and 1890, a tax of two-fifths of a mill upon each dollar of the taxable property in the state, and then enacts that "the proceeds of the levy herein provided for are hereby appropriated for the exclusive purpose of continuing the construction of the main or central building of the state house," etc. We think the appropriation provided for by this act was *in præsenti.* It was an appropriation dating from the time of the taking effect of the act. The legislature says in the first section of the act that the proceeds of the levy "*are hereby appropriated,*" using the present tense, and does not say that such proceeds shall at some future time be appropriated. At the time this act was passed a considerable amount of the fund provided for by the levies of the several previous years from 1879 up to the present time for state-house purposes had not yet been collected or paid into the state treasury, and much of it might not be collected or paid into the state treasury for some years yet to come; and by § 2 of the aforesaid act of 1889, the legislature enacted as follows:

"SEC. 2. That the money in said state-house fund unex-

pended at the expiration of the present fiscal year, and also all money which shall come into said fund by virtue of taxes heretofore levied, be and is hereby reäppropriated for the purposes specified in section 1 of this act."

It will be seen from this section that the legislature "reappropriated" any money that might subsequently and for the next two years come into the state-house fund by virtue of previous levies of taxes for state-house purposes. Now this money could not have been reäppropriated unless it had previously been appropriated, and its previous appropriation was made in precisely the same manner as the appropriation of the proceeds of the levies for the years 1889 and 1890 was made. Hence it will be seen from this language also that the legislature intended by its use of the word "appropriated," in the first and third sections of the act of 1889, a *present* appropriation.

Also, from the beginning of 1879 up to the present time the state-house commissioners have let contracts and had work done upon the state house for which the contractors were to receive compensation, whether any money was at the time actually in the state treasury, or not; and unless the appropriation made in each of the several years shall be considered as having been made at the time of the taking effect of the several acts making the same, then at least since 1886 these acts of the state-house commissioners have been in violation of law; for under the statutes hereafter cited they had no right to pledge the credit of the state in any manner for any greater sum than was appropriated. (Laws of 1886, ch. 103, § 2; Laws of 1887, ch. 37, § 1; Laws of 1889, ch. 51, § 3.) That provision of the act of 1886 above referred to applies to officers in general. The provisions of the acts of 1887 and 1889 above referred to have relation only to the board of state-house commissioners. The act of 1887 provides that "the board of state-house commissioners are hereby prohibited from making any contract whereby the expenditure of any greater sum of money shall be required than is herein *appropriated;*" and the act of 1889 provides substantially the same thing, and is

in almost the same language. And yet the board of state-house commissioners has at all times proceeded to make contracts whereby the expenditure of money would be required, whether there was any money in the state treasury, or not; and the legislature, knowing this, passed the acts of 1887 and 1889 without further prohibition, and of course meaning that the appropriation of the state-house fund was an appropriation of all the fund that the levies would bring, and an appropriation *in præsenti*, and having from the time of the taking effect of the act making the appropriation, and was not merely a future appropriation, to come into force only as the proceeds should be actually paid into the state treasury, and an appropriation of only so much of the proceeds as should be at any particular time in the state treasury. Of course, under the terms of the statute the appropriation is only of the proceeds of the levy of the taxes, but evidently the legislature meant a *present* appropriation of the proceeds to be collected or realized in the future, and not a future appropriation of such proceeds.

But taxes collected under a levy made by or for the state certainly become proceeds of such levy long before they reach the state treasurer's office. They are proceeds of such levy as soon as they are paid into the offices of the various county treasurers of the state, and do not remain something else than proceeds until they reach the state treasurer's office. When they are received by the county treasurers they then become public funds, and belong to the state, and cannot then or afterward be used for any other purpose than the purpose for which they were appropriated. And how much of the proceeds of the various levies from 1879 up to the present time, for state-house purposes, remains in the hands of the various county treasurers, neither the state auditor nor the state treasurer at any time knows. It is true that the constitution provides that "No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer period than two years." (Const., art. 2, § 24.) Of course whether the auditor issues his warrant,

or not, it is certain that no money will be *"drawn"* from the treasury upon such warrant unless there is a sufficient amount of money *belonging to the state-house fund* in the state treasury from which such warrant might be paid. Hence the constitution will not be violated in this respect. We think the appropriation is sufficiently specific, for it is an appropriation for the whole amount of the proceeds of the levy, and such proceeds are to be used for a particular and specific object or purpose, and for no other object or purpose; and the amount of the appropriation can be approximately ascertained as soon as the assessment is made. The state-house commissioners have from the beginning let contracts and created debts against the state whether any money belonging to the state-house fund was in the state treasury, or not. Now if such debts may rightfully be created, then why should not the state furnish proper evidence of such debts? It does in fact in one way furnish some such evidence, and has done so from the beginning, for the state-house commissioners and their superintendent of construction in all cases issue to the contractors vouchers for the amount of money due to the contractors. These are certainly some evidences of the debts owing by the state to the contractors, and if such vouchers may legally be given whether there is any money in the treasury, or not, then why may not the auditor's warrant be issued? Chapter 168 of the Laws of 1879, among other laws, governs in this case. (See Laws of 1885, ch. 186, § 2.) Section 12 of chapter 168 of the Laws of 1879, reads as follows:

"SEC. 12. That upon vouchers itemized and duly authenticated by the superintendent of construction as being in accordance with the conditions of the contract or contracts for material furnished, or work done, or service rendered, and the board of commissioners being satisfied of the correctness of the same, it shall be the duty of the said board, through its president and secretary, to certify said accounts to the auditor of state, who shall draw his warrant upon the treasurer of state for the payment thereof out of the building fund provided for in this act, and the treasurer shall pay said warrants out of said fund upon presentation thereof to him in accordance with the general provisions of law."

And § 3 of chapter 51 of the Laws of 1889 reads as follows:

"SEC. 3. That the auditor of state is hereby authorized and directed to issue the warrants necessary to properly carry out the provisions of this act, and the board of state-house commissioners are prohibited from making any contract whereby the expenditure of any greater sum of money shall be required than is herein appropriated."

We think under these sections it is the duty of the auditor of state, whenever the vouchers from the state-house commissioners are presented to him, showing that the state is indebted to the contractors for any specified amount, to immediately issue his warrant to such contractors for such amount, whether there is any money in the state treasury, or not. But it is objected that if the auditor issues his warrant when there is no money in the state treasury with which to pay such warrant, and the payment thereof is thereby delayed, the state may have to pay interest. Now if this is true, is there anything wrong in it? And if it is wrong, then should not all interest laws be abolished? For if it is wrong for the state to pay interest on its debts, then it would also be wrong for any debtor to pay interest on his debts. It is also said that if interest is paid on these debts, then that the whole amount of the debts for state-house purposes with interest might be more than the amount realized from the levies, or in other words, more than the appropriation, and that the state-house commissioners might in that way violate the law. There is no question of this kind, however, in this case, and in all probability the state-house commissioners will see to it in letting contracts and in creating indebtedness against the state, that the state shall not become indebted to a greater amount than can be realized from the levies and appropriations for state-house purposes.

It has also been suggested that with this construction of the statute the state-house commissioners might let the contracts and have all the work done immediately after the appropriation is made, and long before a sufficient amount of money to pay for the construction of the work could be

realized from the taxes, and that the state might therefore be required to pay a very large sum of money as interest. Now public trust and confidence must be reposed somewhere, and we suppose that the state-house commissioners will always look to the best interests of the state. If the necessities of the state should require that the work should be done without delay, notwithstanding that interest might be required to be paid on the debts contracted for such work, then the commissioners would probably have the work done without delay; but if the best interests of the state should require a different course, they would probably pursue a different course. In practice a different course has generally been pursued.

Before closing this opinion, and as some evidence of the general understanding of the legislature in making appropriations as to what an appropriation includes, we would further state that generally more money is appropriated by the legislature for each particular object than there is money in the state treasury at the time of the passage or the taking effect of the act that could be used for such object.

After a careful consideration of all the questions involved in this case, and with some doubts, we have come to the conclusion that the auditor should issue the warrant prayed for by the plaintiffs.

As furnishing some support to these views, see the case of *The State v. Hoffman*, 35 Ohio St. 436, 443.

The peremptory writ of *mandamus* will be issued as prayed for.

All the Justices concurring.