## STATE EX REL. JOURNAL PUBLISHING COMPANY *v.* KENNEY, AUDITOR.

CONSTITUTIONAL LAW—*State revenue—Appropriations.*—Funds which will be realized by the State from the levy of taxes authorized by the legislature for any fiscal year may be treated as revenue for that year, although they are not actually placed in the State treasury until after the commencement of the following fiscal year, and must be held available to meet, when collected, the appropriations made for the fiscal year in which the tax was levied; and therefore an appropriation bill which authorizes expenditures for any year in excess of the revenue actually to be received during that year is not in violation of section 12, article xii. of the Constitution, prohibiting appropriations whereby the expenditures of the State during any fiscal year shall exceed the total tax provided for by law.

AUDITOR—*Duty as to claims approved by State examiners.*—When the appropriation by law for the expenditures of a fiscal year have not exceeded the constitutional limitation, it is the duty of the State auditor to draw his warrant for the amount of a claim for which a lawful appropriation has been made, and which has been approved and transmitted to him by the State board of examiners, and this duty is not dependent upon there being funds in the treasury for its immediate payment.

Original proceeding. Application for writ of mandate.

*McCutcheon & McIntire,* for Petitioner.

*Henri J. Haskell,* Attorney-General, for Respondent.

BLAKE, C. J.—The affidavit of the relator states the following facts: The Journal Publishing Company is a corporation, and entered, March 11, 1889, into a contract with the Territory of Montana to do all the printing thereof pursuant to law. The State under this contract is indebted to the relator in the sum of $7,909.93, for printing for the Territory and State. The accounts therefor were presented by the relator to the State board of examiners, and audited, approved, and allowed in said sum, and were by it certified and presented to the second legislative assembly. Said legislative assembly, by an act entitled "An act to provide for the payment of all claims against the State approved by the State board of examiners and reported to the legislative assembly," approved March 7, 1891, appropriated out of the funds of the State the sum of $7,909.93 to pay this claim. A demand for the relator was made March 14, 1891, of the respondent, that as State auditor he should draw his warrant on the State treasurer for the amount of said claim. The respondent refused to draw any warrant therefor.

The return does not deny any of the foregoing allegations, but contains the following averments: The assessed value of all the property within the State for the last fiscal year was $112,000,000. The revenue of the State thus far for the fiscal year ending November 30, 1891, amounts to $363,332.80. The revenue of the State from a license and property tax for the remainder of this fiscal year will not exceed $70,000. The fiscal year of 1891 commenced December 1, 1890, and ends November 30, 1891. The taxes levied for this fiscal year, and not paid in by the county treasurers and received by the State treasurer until the commencement of the fiscal year, 1892, are carried upon the books of his office for the purpose of paying off all indebtedness for which appropriations have been made by the legislative assembly for the expenditures incurred in the fiscal year ending November 30, 1892; and the sums received after December 1, 1891, by the State treasurer are credited upon his books as funds of the fiscal year 1892, and not for the year 1891. Between February 18, 1891, and March 7, 1891, the legislative assembly passed many appropriation bills, which obtained the approval of the governor in the order which is specified. The answer sets forth particularly the laws which are referred to, the dates of their approval, and the amount appropriated thereby, which exceeds $640,000 for the fiscal year ending November 30, 1891. The appropriation bills which became laws before the act, *supra,* which includes the claim of the relator, appropriated for the fiscal year ending November 30, 1891, out of any moneys in the State treasury not otherwise appropriated, the sum of $558,412.36. The State treasurer has set apart for the purposes which are mentioned in the statutes respectively of the moneys so received the entire sum in the treasury. And the answer further alleges: "That at the present time there is not any money in the State treasury that is available or applicable to the payment of the claim of this relator, nor subject to any warrant that might be drawn in favor of this relator for said claim; that since the twenty-eight day of February, 1891, this resistant has drawn certain warrants upon the State treasury, and which have been paid in accordance with the provisions of the general laws, and in pursuance of the appropriations made in the acts last mentioned, in the

total sum of $95,207.30; that there now is a balance in the
State treasury of $268,125, so set apart as aforesaid; that this
resistant has refused to draw his warrant in favor of the relator
for the claim so presented upon the ground that the last legis-
lative assembly of the State of Montana have authorized expendi-
tures and made appropriations for the fiscal year 1891, prior to
the passage of the act *supra*, hereinbefore referred to, which
exceed the total tax then and now provided by law, and appli-
cable to such appropriation and expenditure, and which exceed
in the aggregate of such total tax the sum of $100,000."

The relator filed a demurrer to the answer, upon the ground
that the facts therein stated did not constitute a defense. The
act *supra*, which is referred to in the affidavit of the relator,
contains the following provisions: "Section 1. That the sum
of $44,648.19 be, and the same is hereby appropriated out of
any moneys in the treasury, not otherwise appropriated, for the
payment of claims against the State, approved by the State
board of examiners, reported to the second legislative assembly.
Sec. 2. That in payment of said claims, the auditor is hereby
directed to draw his warrant upon the State treasury, in favor
of the following persons, and for the following amounts." In
this list the relator is named, and the amount is the same as
that which is specified in the affidavit.

The statute provides that "the first day of December in each
and every year shall be the end of the fiscal year for territorial
(State) purposes." (Comp. Stats. fifth div. § 140.) It is dis-
closed by the answer and admitted by the relator that the second
legislative assembly appropriated for the fiscal year of 1891 the
sum of $640,000, and that a large part thereof, the sum of
$558,412.36, was embraced in laws which were approved prior
to the act *supra*, under which the relator asserts his rights in
this proceeding. The revenue which has been received during
this fiscal year, and which, it is estimated, will be received dur-
ing the remainder thereof, amounts to the sum of $433,332.80.
The deficit seems to be the sum of $217,000, or thereabouts.
The respondent for this reason refuses to draw his warrant in
behalf of the relator, and maintains that said legislative assem-
bly has appropriated an amount in excess of the money in the
treasury of the State, or which could be made available there-

for, during the fiscal year of 1891. The following section of the Constitution is cited to uphold his action: "No appropriation shall be made or any expenditures authorized by the legislative assembly whereby the expenditures of the State during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditure, unless the legislative assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rate allowed in section nine (9) of this article, to pay such appropriations or expenditures within such fiscal year. . . . . No appropriation of public moneys shall be made for a longer term than two years." (Art. xii. § 12.)

The opinion of the justices of the Supreme Court of the State of Colorado (*In re Appropriation*, 13 Colo. 316), considers similar constitutional provisions, and says: "It will be observed that appropriations and expenditures for ordinary purposes are legitimate so long as they do not exceed the total tax already provided by law, and applicable for their payment, or which may, within constitutional limits, be so provided for their payment within the proper fiscal year. . . . . What we have said of the legislative department in respect to making appropriations or authorizing expenditures in excess of constitutional authority applies with equal force to the executive department in recognizing or dealing with legislation affecting the public revenue. If legislative acts making appropriations in excess of constitutional limits have unfortunately received the governor's signature instead of his veto, he should nevertheless withhold his approval from any and all vouchers relating to such unconstitutional appropriations. So, also, the auditor should refuse to draw any warrant therefor, and the treasurer should decline to make payment thereon. In reference to matters arising under enactments clearly unconstitutional, the unauthorized act of one government official is no justification or excuse for a similar act by another."

It is obvious that the responsibility of the legislative assembly is of the utmost gravity. The ninth section, *supra*, declares that the rate of taxation of real and personal property for State purposes in any one year shall not exceed two and one-half mills on each dollar of valuation, whenever such property shall

amount to $100,000,000. (Art. xii. § 9.) By virtue of the power herein conferred, an act was passed by this legislative assembly and approved March 4, 1891, which levied for the fiscal years of 1891 and 1892, respectively, the highest rate of taxation which was allowed, to wit, two and one-half mills on each dollar of such valuation. "Any legitimate expenditure of the State," said the court in *People* v. *Scott*, 9 Colo. 422, "necessary to be provided for by a State tax is a State purpose, and the tax to be provided is a tax for a State purpose." We assume what is not controverted in this hearing, that the acts of the second legislative assembly, *supra*, which are enumerated in the answer and embody appropriations, are within this definition of the constitutional expression, "State purposes."

In performing the grave task of observing this restriction of the Constitution, some difficult problems require solution. We again quote from the opinion (*In re Appropriation, supra*), which sheds considerable light upon this inquiry, and says: "We are asked what legal criterion is fixed by which it can be known, at the date of an act appropriating or authorizing the expenditure of money, whether such appropriation or expenditure will be in excess of the prescribed constitutional limits. We answer that there is no absolute criterion which can be relied upon in every instance and under all circumstances. The general assembly must, of necessity, exercise their own judgment in the first instance." It is also stated that the legislators must obtain all the information respecting the public revenue and probable expenses of the government, which can be derived from the reports of officers and the testimony of other persons concerning these matters. It may, therefore, be reasonably presumed that the second legislative assembly of the State acted upon the knowledge within its command that the valuation of the taxable property for the fiscal year, 1890, was $12,000,000, and that this rate of taxation would yield a revenue of $280,000 per annum for the fiscal years, 1891 and 1892. The aggregate of this sum and the above amount of $433,332.80 is $713,332.80.

The act concerning revenue, approved March 6, 1891, provides that the county clerk shall, on or before the first Monday of October, "deliver a copy of the corrected assessment book,

to be styled, 'duplicate assessment book,' to the county treasurer." (§ 90.) "Within ten days after the receipt of the 'duplicate assessment book,' the county treasurer must mail to each taxpayer the following notice: (1) Amount of taxes. (2) That taxes will be delinquent after the first day of December, and that unless paid prior thereto, ten per cent will be added to the amount thereof. (3) The time and place at which payment of taxes may be made." (§ 96.) "The treasurer of each county in this State shall be by virtue of his office collector of taxes therein." (§ 185.) "After December 1st of each year, all unpaid taxes are delinquent." (§ 100.) "On the first Monday in March, June, September, and second Monday in December, the county treasurer must settle with the county commissioners for all moneys collected for the State or county." (§ 99.) "Each county treasurer shall, at the expiration of every three months, render an account of, and cause to be paid over to the State treasurer, the amount of all moneys collected for State purposes, and shall complete the collection of all lists delivered to him, and at the expiration of each fiscal year, and at the expiration of his term of office, shall make final settlement with the county commissioners of his county, and shall report to the State treasurer immediately thereafter a correct statement of the amount found due the State, and the county treasurer shall remit to him such amount." (§ 183.)

It is apparent from these provisions of the statute that the taxes for State purposes become due and payable in the month of October, and that the county treasurers are the agents of the State in the collection thereof. They are required to settle their accounts at certain periods, and remit to the State treasurer the amount of the taxes which has been ascertained to be due. In complying with the requirements of the law, it is not possible for them to pay into the treasury of the State before the end of the fiscal year the amount of the taxes which have been levied and collected for that term. It is a safe assertion that only a small part of such taxes, if any, will be received by the State treasurer during the fiscal year. It is the contention of the respondent that, under these conditions, the funds which will be realized from the levy of the taxes which have been authorized by the second legislative assembly for the year

1891 cannot be treated as revenue for that period, and that the same should be credited to the proper accounts of the fiscal year 1892, because they will be actually placed in the State treasury after the commencement of the last-named year. We dissent from this proposition. The section, *supra*, of the Constitution does not use the terms "revenue" or "funds," but declares that "the expenditures of the State during any fiscal year shall not exceed the total tax then provided for by law." The mere circumstance that a brief delay occurs in the transfer of the money, which is the property of the State, to the official custodian thereof, does not touch the question.

In *Evans* v. *McCarthy*, 42 Kan. 426, Mr. Justice Valentine for the court said: " But taxes under a levy made by or for the State certainly become proceeds for such levy long before they reach the State treasurer's office. They are proceeds of such levy as soon as they are paid into the offices of the various county treasurers of the State, and do not remain something else than proceeds until they reach the State treasurer's office. When they are received by the county treasurers they then become public funds, and belong to the State, and cannot then or afterward be used for any other purpose than the purpose for which they were appropriated." The treasury of the State in the eyes of the law will be the recipient of the proceeds of said levy for the fiscal year 1891, to wit, the sum of $280,000, before the end thereof. We conclude that this amount, which has been estimated to be the revenue from the direct tax for the fiscal year 1891, should be held available to meet in the future, when collected, some of the appropriations which were made for the same time; and that the act *supra*, for the relief of the relator and other parties, does not violate any clause of the organic law of the State.

The respondent insists that he cannot be required to draw his warrant for the relator unless there are funds in the treasury for its immediate payment. Our attention has not been directed to the words of any statute or the Constitution which sustain this view, and the authorities express an opinion to the contrary. The same cases cover this and another proposition which has been examined. In *State* v. *Hoffman*, 35 Ohio St. 435, Mr. Justice White as the organ of the court said: "There

is no validity in the claim set up by the defendant, that there is no money in the treasury of the city with which to pay the warrant, should one be issued. The duty enjoined on the defendant as auditor of the city to issue the warrant is not made dependent on whether there is money in the treasury to pay the warrant. On ascertaining the amount that ought to be paid by the city, in the mode prescribed, he is directed to issue his warrant upon the city treasurer for the amount so ascertained, to be paid out of the general fund of the city, and the same is declared to be a sufficient voucher. The duty of paying the warrant is devolved on the treasurer, and whether he has funds or not with which to take up the warrant is no concern of the auditor in discharging the duties imposed upon him by the statute." In *McCauley* v. *Brooks,* 16 Cal. 11, Mr. Justice Field for the court said: "In an appropriation, within the meaning of the Constitution, nothing more is requisite than a designation of the amount, and the fund out of which it shall be paid. It is not essential to its validity that funds to meet the same should be at the time in the treasury. As a matter of fact, there have seldom been in the treasury the necessary funds to meet the several amounts appropriated under the general appropriation acts of each year. The appropriation is made in anticipation of the receipt of the yearly revenues. It constitutes, indeed, the authority of the controller to draw his warrants, and of the treasurer, when in funds, to pay the same, and that is all." (See, also, *Evans* v. *McCarthy, supra; Ash* v. *Parkinson,* 5 Nev. 15; *Swann* v. *Buck,* 40 Miss. 268; *Springfield* v. *Edwards,* 84 Ill. 626; *Law* v. *People,* 87 Ill. 385.)

The act prescribing the duties of the State board of examiners provides that any person who has a claim against the State, and for which an appropriation has been made, shall present the same for its action. This statute derives its power from the Constitution. (Art. vii. § 20.) The seventh section of the act provides further: "If the board approve such claim, they shall indorse thereon, over their signatures, 'approved for the sum of —— dollars,' and transmit the same to the office of the State auditor, and the auditor shall draw his warrant for the amount so approved in favor of the claimant . . . . in the order in which the same was approved." But the respondent must

investigate and decide in all cases. according to the rules of interpretation which have been laid down in this opinion, whether the appropriations for the fiscal year have exceeded the limitations which have been prescribed by the Constitution, and act accordingly. The relator has complied with the laws which have been enacted in pursuance of the Constitution ; the legislative assembly has made a lawful appropriation for the payment of his claim; and the State board of examiners has approved and transmitted the same to the respondent. It is therefore the legal duty of the State auditor to draw his warrant in favor of the relator for the amount of this claim.

The demurrer must be sustained, and as the respondent declines to file any other answer, it is ordered and adjudged that the peremptory writ of mandate issue according to the prayer of the affidavit.

HARWOOD, J., and DE WITT, J., concur.