No: 40,507

STATE OF KANSAS, ex rel., John Anderson, Jr., Attorney General, *Plaintiff*, v. RICHARD T. FADELY, State Treasurer of the State of Kansas, and ROY SHAPIRO, Controller of the State Department of Administration of the State of Kansas, *Defendants.*

(308 P. 2d 537)

Opinion filed March 5, 1957.

*John Anderson, Jr.,* Attorney General, of Topeka, argued the cause, and *Paul E. Wilson, Robert E. Hoffman* and *Charles C. McCarter,* Assistant Attorneys General, all of Topeka, were with him on the briefs for plaintiff.

*Ward D. Martin,* of Topeka, argued the cause, and *A. Harry Crane, Arthur L. Claussen, Harvey D. Ashworth* and *C. H. Hobart,* all of Topeka, were with him on the briefs for defendants.

The opinion of the court was delivered by

FATZER, J.: This is an original proceeding in mandamus brought by the attorney general to determine the constitutionality of acts of the legislature establishing a state emergency fund, making appropriations thereto, and creating a state finance council. The prayer of the amended petition is that the state treasurer and the controller be commanded to transfer all moneys in the state emer-

gency fund, consisting of $948,748, to the general revenue fund in the state treasury and to make appropriate record of such transfer.

The allegations of the amended petition and amended answer will not be summarized. Suffice it to say it is alleged in the amended petition and denied in the amended answer that the acts in question, G. S. 1955 Supp. 75-3708 to 75-3714, inclusive, hereafter referred to as the state finance council act, and §§ 22 and 34 of Ch. 2, and Ch. 34, Budget Session Laws 1956, hereafter referred to as the appropriation acts, violate the constitution of Kansas for reasons asserted, and are therefore unconstitutional and void.

Before considering the statutes alleged to be invalid, a brief history of preceding acts leading up to their enactment will be helpful. In 1943 the legislature established a state war emergency fund, created a state war emergency fund board (Ch. 207, Laws 1943), and transferred out of the retail sales tax fund the sum of $500,000 to such fund (Ch. 310, Laws 1943) for the use and purposes of such board as provided in Ch. 207, Laws 1943. Sec. 2 of the last mentioned act created the state war emergency fund board and provided that its six members consist of the governor, lieutenant governor, auditor of state, speaker of the house of representatives and chairman of the committee on ways and means of the senate and of the house of representatives. Sec. 3 set forth the powers and authorities of such board and provided that while the United States was engaged in hostilities with any foreign nation and no longer, such board, by unanimous vote of all its members, was authorized and empowered to make allocations to and authorize expenditures by various state agencies from the state war emergency fund for two purposes, i. e., (1) preservation of the public health and protection of persons and property from extraordinary conditions arising out of the war and which were not foreseen at the time appropriations were made by the regular session of 1943; (2) repair or temporarily replace buildings or equipment owned by the state and destroyed or damaged by sabotage, fire, wind, tornado or act of God if such building or equipment was absolutely necessary to the continued functions of the particular state agency using the same.

In 1945 the regular session of the legislature (Ch. 66, Laws 1945) appropriated all moneys credited to the state war emergency fund to the state war emergency fund board for the purposes specified in Ch. 207, Laws 1943, and directed that any unexpended balance

existing on April 2, 1947, be transferred to the retail sales tax fund. In addition it appropriated the sum of $79,732.20 from the general revenue fund of the state to the state war emergency fund board for the use and purposes provided in Ch. 207, Laws 1943. The pleadings admit that during the fiscal years 1943 to 1947, inclusive, the state war emergency fund board made allocations of the total sum of $381,751.12 out of the state war emergency fund and authorized the expenditure of such amount by various state agencies for the purposes specified.

The 1947 regular session of the legislature repealed all laws relating to the state war emergency fund and the state war emergency fund board, and created in lieu thereof a state emergency fund and a state emergency fund board (Ch. 402, Laws 1947) and directed that all unencumbered and unexpended balances in the state war emergency fund be transferred to the state emergency fund created by such act. In addition there was appropriated out of the general revenue fund of the state the sum of $294,018.92 to the state emergency fund for the use of the state emergency board (Ch. 403, Laws 1947). At the same regular session (Ch. 404, Laws 1947) there was created a state school emergency fund and the state emergency fund board was authorized to make allocations to and authorize expenditures by various state educational institutions for the purpose of paying increased costs of operating said institutions subsequent to the passage of the act. $1,200,000 was appropriated out of the general revenue fund of the state for this purpose.

In both the 1949 and 1951 regular sessions of the legislature all unencumbered and unexpended balances in the state emergency fund were appropriated and made available to the state emergency fund board for the use and purposes provided in Ch. 407, Laws 1947, and in addition, a total of $783,986.95 was appropriated from the general revenue fund of the state to the state emergency fund (Ch. 55, 56, Laws 1949; Ch. 33, 34, 35, Laws 1951).

At the regular 1953 session of the legislature all laws relating to the state emergency fund and the state emergency fund board were repealed and the state department of administration and the state department of post-audit were created (Ch. 375, Laws 1953, now G. S. 1955 Supp. 75-3701 to 75-3904). The act, insofar as it relates to the state department of administration, established a budget division, an accounts and reports division, a purchasing division,

a personnel division and the state finance council to insure a uniform system of budgeting, accounting, disbursing and auditing of state funds. The various sections of the 1953 act creating the state finance council now appear as G. S. 1955 Supp. 75-3708 to 75-3714, inclusive, and have not been amended except 75-3713 commented upon below. These statutes are quoted and summarized as follows: G. S. 1955 Supp. 75-3708 reads:

"Members of finance council; chairman; secretary. There *is* hereby created the state finance council consisting of six members. The members of the finance council shall be (1) the governor, (2) the lieutenant governor, (3) the president pro tem of the senate, (4) the speaker of the house of representatives, (5) the chairman of the senate committee on ways and means, and (6) the chairman of the house of representatives committee on ways and means. The governor shall be the chairman and the executive director shall be the secretary of the council but shall not be a member of such council."

G. S. 1955 Supp. 75-3709 relates to vacancies in the office of the members of the state finance council and provides for the filling of such vacancies under certain conditions.

G. S. 1955 Supp. 75-3710 relates to meetings of the finance council and provides that,

". . . The legislative members of the council, and the lieutenant governor, shall be compensated for the time spent in attendance at meetings of the council at the rate of twenty dollars ($20) per day, and actual traveling and necessary expenses incurred while attending the meetings. . . ."

G. S. 1955 Supp. 75-3711 prescribes the powers and duties of the state finance council, which are quoted and summarized: (1) Advise in the preparation of state budgets and may appoint a member or members to be present during the preparation of such budgets and hearings thereon; (2) hear and determine appeals by any state agency from final acts of the executive director (director of the department of administration); (3) approve or disapprove rules and regulations submitted by the executive director; (4) "Make allocations to, and approve expenditures by a state agency, from any appropriations to the finance council for that purpose, of funds for unanticipated and unbudgeted needs, under conditions and limitations prescribed by the legislature"; (5) provide for independent investigations and make findings, recommendations and reports thereon as may be determined necessary and publish the same for consideration by the governor, the legislative council and the legislature; and (6) perform duties as required by G. S. 1955 Supp. 75-3747 and 75-3748 with respect to the Civil Service law and such other duties as required by law.

G. S. 1955 Supp. 75-3712 reads:

*"State emergency fund.* The state emergency fund created by section 74-4105 of the General Statutes of 1949 is hereby continued in the office of the treasurer of state for the use of the state finance council created by section 8 [75-3708] of this act for the purposes and within the limitations prescribed by sections 13 [75-3713] and 14 [75-3714] of this act."

G. S. 1955 Supp. 75-3713 reads:

*"Same; authorization of expenditures; purposes.* The state finance council, by unanimous vote of all its members, is hereby authorized and empowered to make allocations to, and authorize expenditures by, state agencies from the state emergency fund for the following purposes, subject to the limitations hereinafter prescribed: (1) Preservation of the public health and the protection of persons and property from extraordinary conditions arising after, or which were not foreseen at the time, appropriations were made by the preceding regular legislative session. (2) Repair or temporary replacement of any building or equipment owned by the state which has been destroyed or damaged by sabotage, fire, flood, wind, tornado, catastrophe or act of God if such building or equipment is absolutely necessary for carrying out the function of the state agency using such building or equipment. (3) Supplementation of a fund or account of any state agency for the remainder of the current fiscal year after the adjournment of a regular budget session of the legislature held in an even-numbered year: *Provided,* Such supplementation is specifically recommended in the governor's budget report to such legislative session: *Provided further,* Such supplementation shall not have been provided for, in whole or in part, by the legislative budget session at which said supplementation is so recommended."

The 1955 regular session of the legislature amended G. S. 1951 Supp. 75-3713 (Ch. 372, Laws 1955) by adding thereto subsection (3) quoted above as G. S. 1955 Supp. 75-3713.

G. S. 1955 Supp. 75-3714 provides that the secretary of the finance council shall keep minutes of its proceedings which shall be signed by each member of the council present, which shall be open to public inspection during regular office hours.

The record discloses that for the fiscal years 1947 to 1953 the state emergency fund board allocated to certain state agencies and authorized the expenditure of $863,578.66; that for the fiscal years 1954 to 1956 the state finance council allocated to various state agencies and authorized the expenditure of $449,255.87, and that total sums allocated and expenditures authorized for the fiscal years 1947 to 1956, inclusive, was $1,312,834.53. Although the question is not before the court, we note in passing that some of the items of authorized expenditures from the emergency fund do not appear to be for purposes authorized by 1955 Supp. 75-3713.

As indicated previously, the emergency fund appropriation acts

here under attack are §§ 22 and 34 of Ch. 2, and Ch. 34, Budget Session Laws 1956. Ch. 2 is an act making appropriations for fiscal year 1957, and § 22 thereof reads:

"There is hereby appropriated out of the following special revenue funds . for the fiscal year ending June 30, 1957, all monies now on deposit with the state treasurer to the credit of, or as may hereafter be collected by, or for, to each of the following officers, departments, boards, commissions, institutions, agencies and other activities of the state as set forth in section 23 to section 53, both inclusive, of this act, as now provided by law or as may hereafter be provided by law, to the extent actually collected and available, to be used as provided by law, but not to exceed the amounts set forth in such sections."

Sec. 34, insofar as it relates to the state emergency fund, reads: "To the

### DEPARTMENT OF ADMINISTRATION

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . . . . . . . . . . . . . .

"State emergency fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . No limit

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "

Ch. 34 authorized and directed the state treasurer to transfer the sum of $22,382 out of the general revenue fund of the state and credit the same to the state emergency fund. Sec. 2 thereof reads:

"That said sum of $22,382.00 so authorized to be transferred by section 1 of this act is hereby appropriated and made available to the state finance council for the use and purposes and with the limitations imposed and prescribed by section 75-3713 of the General Statutes Supplement of 1955."

Upon publication, May 10, 1956, of the Budget Session Laws, there was a fund balance of $948,748 in the state emergency fund resulting from appropriations and reappropriations, including the amount appropriated by Ch. 34, subject to allocation by the state finance council for use and purposes provided in G. S. 1955 Supp. 75-3712 and 75-3713. This is the fund which plaintiff seeks the aid of this court to compel the defendants to transfer to the general revenue fund of the state.

The amended petition alleges that the finance council act and the emergency fund appropriation acts are unconstitutional and void for the reason that said acts violate the provisions of Art. 2, § 24 of the constitution of the state of Kansas, which reads:

"No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years."

As preliminary to a consideration of the contentions of the plaintiff, we refer to long and well-established rules of this jurisdiction to the effect that the constitutionality of a statute is presumed and

that all doubts must be resolved in favor of its legality and before the statute may be stricken down it must clearly appear the statute violates the constitution (*Carolene Products Co. v. Mohler*, 152 Kan. 2, 102 P. 2d 1044; *Board of County Comm'rs v. Robb*, 166 Kan. 122, 199 P. 2d 530; *State, ex rel., v. Board of Regents*, 167 Kan. 587, 207 P. 2d 373); that it is the court's duty to uphold the legislation rather than defeat it and if there is any reasonable way to construe the legislation as constitutionally valid, that should be done (*Marks v. Frantz*, 179 Kan. 638, 298 P. 2d 316); that, at the threshold of the inquiry of validity of a statute, courts start with the presumption the lawmakers intended to enact a valid law and to enact it for the accomplishment of a needful purpose (*State, ex rel., v. Board of Education*, 137 Kan. 451, 453, 21 P. 2d 295); that courts do not strike down legislative enactments upon the mere ground they fail to conform with a strictly legalistic definition or technically correct interpretation of constitutional provisions; rather, the test is whether the legislation conforms with the common understanding, the true intention, of the people at the time they adopted the constitutional provision and the presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who adopted them (*Hunt v. Eddy*, 150 Kan. 1, 90 P. 2d 747); and, that one of the established principles which has become cardinal and elementary in the field of constitutional law is that the propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere (*State, ex rel., v. State Highway Comm.*, 163 Kan. 187, 182 P. 2d 127).

Although plaintiff states in its brief that it questions the advisability of the form of the appropriation of Ch. 2, § 34, Budget Session Laws 1956, it does not contend the appropriation, because of the "no limit" amount contained therein, violates Art. 2, § 24, nor that such provision is violated when unexpended fund balances of a state agency are reappropriated to it by the legislature for the ensuing fiscal year, in which the amount of such reappropriation is not specifically fixed. In conformity with the general rule of law,

this court will not consider or pass upon this question since questions of constitutionality of a statute not duly raised nor insisted upon and adequately argued are not properly before it (*Missionary Baptist Convention v. Wimberly Chapel Baptist Church*, 170 Kan. 684, 228 P. 2d 540; *State, ex rel., v. Richardson*, 174 Kan. 382, 256 P. 2d 135).

Plaintiff asserts that the emergency fund appropriation acts are not "specific appropriations made by law" as required by Art. 2, § 24 of the constitution when applied to the use and purposes provided in G. S. 1955 Supp. 75-3713, and are unconstitutional and void; the contention being that the term as used in Art. 2, § 24 means an appropriation must contain three basic elements, *i: e.,* (1) that it be made by an act of the legislature; (2) that it be specific in amount; and (3) that such amount be set aside for a specific purpose, conceding, however, that an act appropriating money for one specific purpose without detailed itemization is constitutional; and, it is argued that an appropriation of a lump sum for the multiple purposes prescribed in G. S. 1955 Supp. 75-3713 is not specific since it does not specifically fix the amount for each of the three purposes set forth, and, therefore, is not specific in amount or specific in purpose within the purview of Art. 2, § 24.

In view of the contention made our first inquiry is to ascertain what is meant by the term "specific appropriation made by law" as contained in Art. 2, § 24 of our constitution. In 96 years of statehood this court has not previously been called upon to answer this specific question, nor do the Proceedings and Debates of the Wyandotte Constitutional Convention of 1859 throw light upon the meaning of this term except to indicate that this section was modeled after Art. 2, § 22 of the Ohio state constitution of 1851 and was, word for word, with that Ohio section. (Proceedings and Debates, Wyandotte Constitution Convention, 1859, pp. 666-683.)

Counsel for both the plaintiff and the defendant cite many cases from other jurisdictions construing the term "specific appropriation made by law." We do not deem it necessary to review these authorities since the constitutional provision of the states in which those cases were decided vary in terms and meaning from the language used in Art. 2, § 24 of our constitution.

The power to appropriate the money of the state is a legislative power (81 C. J. S., States, § 161, p. 1203), and, except as is restricted by the provisions of Art. 2, § 24, the legislature has the exclusive power to decide how, when and for what purposes the

public funds shall be applied in carrying on the state government. The term "specific appropriation made by law" may be defined as an authority of the legislature, given at the proper time and in legal form to the proper officials, to apply a distinctly specified sum from out of the state treasury, in a given period, for a specified objective or demand against the state. In general terms a "specific appropriation made by law" is the act of setting money apart formally or officially for a special use or purpose by the legislature in clear and unequivocal terms in a duly enacted law (42 Am. Jur. Public Funds, § 43, p. 747; 81 C. J. S., States, § 163, p. 1207, § 164b, p. 1215 and § 164c, p. 1217). Authorities in support of this statement are *Martin v. Francis, Treasurer*, 13 Kan. 220, 227, 228; *Evans v. McCarthy*, 42 Kan. 426, 429, 430, 22 Pac. 631; *Henderson v. Hovey*, 46 Kan. 691, 692, 27 Pac. 177; *State ex rel., v. Stover*, 47 Kan. 119, 121, 27 Pac. 850. See, also, *State, ex. v. Defenbacher*, 158 Ohio St., 268, 91 N. E. 2d 512. Giving the words used in Art. 2, § 24 of the constitution their common and ordinary meaning it seems reasonably clear to this court that money belonging to the state and rightfully in the state treasury and over which the legislature has the rightful control, cannot be withdrawn from the treasury except in pursuance of an act passed by the legislature setting apart or assigning such money to a particular public use for a term not longer than two years which must be specific in amount and specific in purpose to indicate, with reasonable exactness, to the public officials who are authorized to withdraw and use, within such period, the sum so appropriated or set apart to the objective, purpose or plan sought to be accomplished by the appropriation, and for no other purpose (*Martin v. Francis, Treasurer*, supra; *Evans v. McCarthy*, supra; *Henderson v. Hovey*, supra; *State, ex rel., v. Stover*, supra; *State, ex. v. Defenbacher*, supra).

With respect to the emergency appropriation acts under consideration, the plaintiff directs our attention to G. S. 1955 Supp. 75-3712 and points out that the emergency fund is continued for the use of the finance council and for the purposes prescribed in G. S. 1955 Supp. 75-3713; that by the latter section, the finance council is authorized to allocate to state agencies from the emergency fund for the *"purposes"* enumerated, and contends that money appropriated for *"purposes"* is not for a "specific purpose" or a "specific sum" as required by Art. 2, § 24. We do not believe the contention is meritorious. While there is no specific recital in the statutes (G. S. 1955 Supp. 75-3712 and 75-3713; Ch. 2, §§ 22, 34; Ch. 34, Budget

Session Laws 1956) declaring an emergency to exist with respect to the conditions specified, we think when these acts are considered together and given their fair import, it is clear the legislature determined its policy and purpose to protect the state in the interim between sessions, from the evil effects due to contingencies or emergencies which might arise and which could not be provided for prior to their occurrence, or without the necessity of the governor calling the legislature into special session after they had occurred. The contingencies or emergencies which the legislature anticipated most likely to occur are specifically set forth in G. S. 1955 Supp. 75-3713, and the limitation placed on the power of the finance council was that only such sums as were necessary to remedy the mischief caused by them were to be allocated or expended. We think it may reasonably be said that the multiple purposes specified in G. S. 1955 Supp. 75-3713 are all embraced within the single specific purpose for which the appropriations were made, *i. e.,* to meet and solve declared contingencies or emergencies which may arise in the state government after, or which were not foreseen when, the legislature was in session, or with respect to subsection (3), when the need to supplement an account of a state agency occurs after the adjournment of a budget session and such supplementation was recommended by the governor in his budget report to such session. While the appropriations constitute a lump sum and may, at the discretion of the finance council, be allocated to state agencies for purposes specified and the amounts so authorized to be expended are charged against the lump sum, this does not render the appropriation void. (*Wells v. Childers,* 196 Okla. 339, 165 P. 2d 358; *Sibel v. State Board of Public Affairs,* 206 Okla. 433, 244 P. 2d 307; 81 C. J. S. States, § 156, p. 1194.) The fact that the money set apart by the appropriation acts to the credit of the emergency fund may be allocated by the finance council to either or all of the purposes specified does not defeat the singleness or certainty of their purpose. On the contrary, each act is a specific appropriation to meet the contingencies or emergencies defined in the statute. We point out, however, that the statute authorizing the finance council to allocate and authorize the expenditure of the amounts appropriated requires that such contingencies or emergencies be restricted to those clearly enumerated, and does not contemplate or authorize the finance council to create at will contingencies or emergencies for which the emergency fund may be allocated and expended. We are of the opinion that the appropria-

tion acts in question, when applied to the use and purposes prescribed in G. S. 1955 Supp. 75-3713, are specific appropriations made by law as above defined, and that they do not violate the provisions of Art. 2, § 24 as above construed and interpreted. The contention of the plaintiff cannot be sustained.

The amended petition next alleges that G. S. 1955 Supp. 75-3711 (4) and 75-3713 (3) constitute an invalid attempt to delegate to a statutory board legislative power vested in the house of representatives and the senate of the state of Kansas by Art. 2, § 1 of the constitution, which reads: "The legislative power of this state shall be vested in a house of representatives and senate," and further, that if the power vested in the finance council is determined to be administrative in character there are no standards fixed by these acts whereby discretion of the members of the finance council may be governed. In support of the contention plaintiff cites *Oakland State Bank v. Bolin,* 141 Kan. 126, 40 P. 2d 437; *Langworthy v. Kadel,* 141 Kan. 250, 29 P. 2d 443; *Brown v. Illinois Bankers Life Assur. Co.,* 144 Kan. 670, 63 P. 2d 165; *State, ex. rel., v. Jackson County Board of Social Welfare,* 161 Kan. 672, 680, 171 P. 2d 651; *State, ex rel., v. Hines,* 163 Kan. 300, 182 P. 2d 865; *Schechter Corp. v. United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. ed. p. 1570.

The statutes under consideration belong to the well-known class in which the legislature enacts a law in general terms, confers on an officer or board executive power to enforce and apply the law, and, to accomplish that end, to ascertain the existence or nonexistence of some fact which the officer or board is required to ascertain. It is settled in this jurisdiction that statutes of this character do not confer legislative power (*Schaake v. Dolley,* 85 Kan. 598, 610, 118 Pac. 80; *Balch v. Glenn,* 85 Kan. 735, 748, 119 Pac. 67; *In re McGee, Petitioner,* 105 Kan. 574, 185 Pac. 14; *City of Pittsburg v. Robb,* 143 Kan. 1, 53 P. 2d 203; *State, ex rel., v. Urban Renewal Agency of Kansas City,* 179 Kan. 435, 296 P. 2d 656). In ascertaining and declaring the facts and conditions upon which the statute shall operate, the officer or board does not exercise legislative power, rather, the legislative power is exercised when the legislature enacts the law and declares that it shall operate upon the existence or nonexistence of some future fact, event or condition. The officer or board simply executes the act of the legislature, and in so doing, is merely an agent of the lawmaking department to ascertain and declare the facts upon which the expressed will of the legislature shall take effect (*Schaake v. Dolley,* supra; *Field v.*

*Clark,* 143 U. S. 649, 692; 12 S. Ct. 495; 36 L. ed. 294). However, the legislature must prescribe standards by which those vested with the power to make the statutes operate will do so in the manner intended. Standards are difficult to define because of their variable nature but have been referred to as conditions, restrictions, limitations, yardsticks, guides, rules, broad outlines and other similar expressions. Clearly, the legislature must declare the policy of the law and fix legal principles which are to control in given cases (11 Am. Jur. Constitutional Law, p. 956, § 240). Ordinarily, the test is whether the provisions of the statute purporting to impose the duty of administration upon an officer or board are sufficiently definite and certain to enable one to know his rights, obligations and limitations thereunder (*State, ex rel., v. Hines,* supra).

With respect to the statutes here under consideration the legislative power was exercised and terminated pursuant to the constitution when the legislature created the finance council and the emergency fund, and made appropriations to it to be allocated pursuant to conditions and limitations prescribed. That was the only legislative power involved and it was exercised by the legislature. The duties imposed upon the finance council were administrative in character, *i. e.,* to ascertain the facts and conditions upon which the statutes were declared to operate, and, when so ascertained, to allocate funds for the purposes specified: (1) The "preservation of the public health and the protection of persons and property from extraordinary conditions arising after, or which were not foreseen at the time, appropriations were made by the preceding regular legislative session"; (2) repair or temporarily replace any state building or equipment "destroyed or damaged by sabotage, fire, flood, wind, tornado, catastrophe or act of God if such building or equipment is absolutely necessary for carrying out the function of the state agency"; and (3) to supplement a fund or account of a state agency for the remainder of the current fiscal year after adjournment of a budget session if the same was recommended in the governor's budget report to the budget session and not provided for by it.

The provisions of G. S. 1955 Supp. 75-3713 demonstrate the necessity that they operate upon the conditions specified; but, the plaintiff asserts they contain no standards. We do not agree. While the standards provided are general in terms, we believe they are sufficient.

Although subsection (1) establishes no criterion as to what shall constitute preservation of the public health, or what findings shall

be made to achieve this beneficial result, or how or in what manner persons or property shall be protected, or what shall constitute "extraordinary conditions," it is evident that the legislature exercised the police power of the state in determining its policy that the public health and safety of persons and property should be preserved and protected from extraordinary conditions and deemed it impracticable, if not impossible, to define, with preciseness, fixed measures in advance by which this result could be accomplished. The term "public health" is not susceptible to accurate definition since it takes on new definitions when new conditions arise, but, generally speaking, it means the wholesome sanitary condition of the community at large (39 C. J. S. Health, p. 811, § 1). Among all the objects sought to be secured by government, none is more important than the preservation of the public health; and, an imperative obligation rests upon the state through its proper instrumentalities or agencies to take all necessary steps to accomplish this objective (25 Am. Jur. Health, p. 287, § 3). Statutes enacted for this purpose should be liberally construed and the most extensive power may be conferred on administrative boards, either state or local, to carry out such purpose (39 C. J. S. Health, pp. 811, 813, § 2). The guide set forth in subsection (1) is the preservation of the public health and the protection of persons and property from extraordinary conditions. Because of varied facts which might affect this policy, the legislature wisely did not undertake to enumerate them, but required them to be ascertained and applied by the finance council. We see nothing seriously wrong with this provision. A statute which confers discretion on an executive officer or board without establishing any standards is a delegation of legislative power and is unconstitutional; but, when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative objective sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations (*In re McGee, Petitioner,* supra; *Matz v. Curtis Cartage Co.,* 132 Ohio St., 271, 7 N. E. (2d) 220; *Weber v. Bd. of Health,* 148 Ohio St., 389 74 N. E. (2d) 331; 25 Am. Jur. Health, pp. 288, 289, § 5; 39 C. J. S. Health, p. 812, § 2). For additional authorities see extensive annotations in 12 A. L. R. 1447; 54 A. L. R. 1110; and, 92 A. L. R. 410. Furthermore, when the statute is considered in its entirety, we think it may reasonably be said that the

term "extraordinary conditions" was intended to relate to the conditions specified in subsection (2), *i. e.*, sabotage, fire, flood, wind, tornado, catastrophe or act of God, and as thus construed, the standards provided are sufficient.

We have no difficulty in concluding that subsection (2) contains an adequate standard. It requires a finding by the finance council, as a condition to allocating funds, that a building or equipment of a state agency has been destroyed or damaged by sabotage, fire, flood, wind, tornado, catastrophe or act of God, and its repair or temporary replacement is essential to carrying on the function of the state agency. Not infrequently state buildings or equipment are destroyed or damaged by the elements enumerated, inflicting substantial loss to the property rights of the state and with curtailment of functions of the state agency. The policy of this state in not insuring its public buildings against destruction or damage by these causes, demonstrates the wisdom of legislation of this character. The finance council may expeditiously allocate funds for the repair or temporary replacement of the buildings or equipment destroyed or damaged so the same may be restored with dispatch to the use of the state agency.

Pursuant to subsection (3) the finance council is required to ascertain that *all* specified conditions exist before it may supplement a fund or account of a state agency. It is unnecessary to enumerate these conditions since they are set forth in the statute. Viewed from this standpoint, the subsection contains adequate standards. Nor do we believe, as plaintiff contends, this subsection authorizes the finance council to amend an appropriation act to a state agency made by a previous regular session. Funds allocated by the finance council in no wise amend the prior appropriation act, nor increase, nor diminish the fund-spending limitation imposed by it. They are supplemental, or in addition, to those made available by the prior appropriation act, and we know of no constitutional restriction prohibiting this method of fiscal procedure.

In applying the provisions of G. S. 1955 Supp. 75-3713 the question confronting the finance council in any given situation is whether the specified conditions exist before it may carry out the legislative mandate and allocate funds for the purposes specified. This question is to be determined like any other question of fact: from a consideration of the conditions existing in the state agency or in the community concerned. The finance council has no discretion

over these conditions. It does not create them and cannot modify them. Its function is to ascertain and declare what they are and the statute dictates what shall be done. It is conceivable that any public trust may be abused but it must be assumed that state officials will act fairly and impartially and in accordance with their best judgment, and a statute allowing them to exercise discretion in such matters is not to be condemned as unconstitutional (*Schaake v. Dolley,* supra; *Balch v. Glenn,* supra).

The plaintiff contends that the duties imposed upon the finance council is an attempt by the legislature to create an administrative tribunal and authorize it to assume functions which the constitution of Kansas contemplates shall be considered by a special session of the legislature upon call of the governor, and, hence, an encroachment upon the power of the chief executive. We do not agree. The fact that the legislature has provided a method to combat harmful effects of contingencies or emergencies it deems most likely to occur when it is not in session, does not preclude the governor from exercising powers vested in him by Art. 1, § 5 of the constitution to convene the legislature into special session if he should chose to do so (*Farrelly v. Cole,* 60 Kan. 356, 56 Pac. 492; *The State, ex rel., v. Howat,* 107 Kan. 423, 430, 191 Pac. 585).

There is left for consideration plaintiff's contention that the provisions of the finance council act appointing members of the legislature as members of the finance council violates the fundamental principle of the separation of powers inherent in our state constitution, *i. e.,* that one department of the government cannot perform the functions of another department. That contention was made and rejected in *State, ex rel., v. Kansas Turnpike Authority,* 176 Kan. 683, 692-696, 273 P. 2d 198, in which it was held that members of the legislature, *i. e.,* the chairman of the committees on roads and highways of the senate and the house of representatives, who were appointed by the act as members of the Authority and performed only administrative duties thereunder, did not constitute an encroachment on the executive in violation of Art. 2, §§ 1 and 3 of the constitution. In its brief and oral argument the plaintiff, conceding that the holding in the Turnpike case, *supra,* is contrary to the contention it makes here, asks that we review the holding and overrule it. We have carefully re-examined that holding and conclude no sound reason exists for overruling it.

The record in this case has been carefully considered and we are

of the opinion that the prayer of the petition should be denied and that judgment should be entered for the defendants. It is so ordered.

HALL, J., not participating.

FATZER, J.: I dissent from paragraph 8 of the syllabus and the corresponding portion of the opinion. Although time presses, I feel a sense of responsibility to set forth my reasons for doing so, since, in my judgment, the question involved is basic and vital to the survival of our form of government and reaches to the heart of our constitutional system. It is simply this: May the legislature, when enacting a law defining the policy of the state, create a board or commission to administer and enforce the law enacted and appoint, by such act, to membership on such board or commission certain of its elected or designated members to perform executive power by exercising the duties prescribed, which are not incidental and have no real relation to legislative power? In my judgment, it may not. The attempt to do so constitutes an usurpation of power placed by the constitution in the executive, and, hence, is illegal and void.

The majority of this court do not share my views and choose to follow *State, ex rel., v. Kansas Turnpike Authority,* 176 Kan. 683, 692-696, 273 P. 2d 198, the purport of which was that the legislature did not usurp the power of the executive when it enacted the Turnpike Act ( G. S. 1955 Supp. 68-2001-68-2029) creating the Authority and appointing two members of the legislature, who were designated officers of its body, to perform administrative duties as members of the Authority. While distinction as to duties and functions of membership may readily be made between the Turnpike Authority and the Finance Council Acts, it is clear to me, however, that both acts purport to impose executive power upon members of the legislature in violation of the constitution of Kansas. In this respect, I view each of the acts with the same perspective. The validity of each is unknown in our constitutional system and has not been previously permitted to exist. The purport of the Turnpike case, *supra.,* and the majority opinion in this case, effect a breach in the wall of separation of executive, legislative and judicial powers of government and permits the power of one department to pour through like an on surging flood to engulf and submerge the power of another department, except for the high pinnacle of the executive office expressly provided in the constitution.

The importance of maintaining three distinct and separate departments of our Republican form of government has been constantly demonstrated, and, as occasions arose, been enforced by the courts. This is so inherent and fundamental that the citation of authority is unnecessary. That the legislature cannot become an administrative body, or, through its members or committees, perform the work of the executive or the judiciary was established in *Springer v. Philippine Islands*, 277 U. S. 189, 48 S. Ct. 480, 72 L. ed. 845. There is a time when the powers of government must be kept separate and apart in order that our form of government may be preserved. The doubtful cases make the trouble—the small beginnings and usurpations create the danger. Everyone becomes alarmed at outright usurpation and we need have no fear of such occurrence; rather, what we should be alive to and ever guard against is the imperceptible but gradual increase into the assumption of governmental power by one department, properly belonging to another. Such is this, and the Turnpike case, *supra.* The principles are firm and clear and it remains merely for the courts to apply them.

The doctrine of *stare decisis* is founded on public policy (21 C. J. S., Courts, § 187, p. 302) and is not universally applicable to all situations without exception. The doctrine is not so imperative or inflexible as to preclude a departure from the Turnpike case, *supra.* Where there has been but a single decision and it is manifest that the law has been erroneously decided, the doctrine ought not be applied (*Kimball v. Grantsville City*, 19 Utah 368, 57 Pac. 1). It does not demand that what is not the law shall become the law. Rather, it induces the court, if it has digressed, to return to well-established principles (1 Kent Comm. 476, 477); particularly so where a decision is in conflict with the provisions of a state constitution (21 C. J. S., Courts, § 193, p. 325).

The Finance Council Act violates the constitution of Kansas in two respects: (I) the distribution of the powers of the state, by the constitution, to the legislative, executive and judicial departments, operates, by implication, as an inhibition against the usurpation by either of those powers which distinctly belong to one of the other departments; and (II), the provisions of Art. 2 § 19 and Art. 15, § 1, imposing upon the legislature the duty to provide for the election or appointment of all officers, not otherwise provided for in the constitution, do not carry with them the power of appoint-

ment to offices created in either the executive or the judicial departments.

## I.

It is commonplace and well understood by the overwhelming majority of the people of this state, including the Bench and Bar, that the constitution of Kansas provides for three distinct and separate departments of government, *i. e.,* the legislative, executive, and the judicial. The legislature makes the laws. The executive must execute and administer the laws enacted. The judiciary interprets, explains and applies the laws to controversies concerning rights, wrongs, duties and obligations arising under the law. This principle of government is taught in our public schools and 6th grade pupils study it in Civics and in Kansas History. It is not a new principle—it is as old as the state itself. If anyone has doubt that the framers of the constitution of Kansas had any intention of establishing a different system of government they need but read the Proceedings and Debates of the Wyandotte Convention of 1859 to ascertain that our government is peculiarly and emphatically a government of checks and balances provided through three distinct and separate departments to establish safeguards around the rights and interests of the people (Proceedings and Debates of the Wyandotte Convention of 1859, pp. 128, 129, 130).

The constitution of Kansas distinctly distributes the powers of government to the executive, legislative and judicial. The executive department consists of the governor, lieutenant governor, secretary of state, auditor, treasurer, attorney general and superintendent of public instruction (Art. 1, § 1). The supreme executive power is vested in a governor who shall see that the laws are faithfully executed (Art. 1, § 3). The legislative power is vested in a house of representatives and senate (Art. 2, § 1). The judicial power is vested in a supreme court, district courts, probate courts, justice of the peace, and such other courts, inferior to the supreme court, as may be established (Art. 3, § 1). However, like that of the constitution of the United States and of the state of Ohio, it is distinguished from other state constitutions in that it does not expressly provide that the three departments of government established shall be distinct and separate from the other. The decisions of this court are uniform and none to the contrary, that the three powers of government are as clearly distinct and separate as though the framers of the constitution had said so in express terms. In *Coleman*

*v. Newby,* 7 Kan. 82, 86, 87, in 1868, seven years after the admission of Kansas into the Union, this court said:

"The great weight of authority seems to be that these three great powers or branches of power of government—the legislative, the judicial, and the executive—are distinct and separate from each other: (cases cited); that they include all the delegated power of the State; (§ 20, Bill of Rights;) and that each is delegated to its appropriate department, *and can be exercised by no other department:* (See authorities above cited, and *Taylor v. Place,* 4 R. I., 354; *People v. Draper,* 15 N. Y., 543; *Taylor v. Porter,* 4 Hill, 144.)" (Emphasis ours.)

In *State v. Johnson,* 61 Kan. 803, 812, 813, 60 Pac. 1068, it was said:

"It will be noticed that there is no express provision in the Kansas constitution to the effect that persons charged with the exercise of powers properly belonging to the one shall not exercise any functions pertaining to either of the others. Yet this court, in the case of *In re Sims, Petitioner,* 54 Kan. 1, 37 Pac. 135, has said:

" *'We think, however, that under our constitution these powers are as clearly separated as though the framers of the constitution had said so in terms.'*

"Mr. Chief Justice Kingman emphasized this by saying that to confer both executive and judicial powers upon a court is 'as dangerous to good government as it is subversive of the constitution which has carefully kept separate the executive, legislative and judicial departments of the government, to the end that it may be a government of laws and not of men.' (*Auditor of State v. A. T. & S. F. Railroad Co.,* 6 Kan. 505.)" (Emphasis ours.)

In *The State v. Railway Co.,* 76 Kan. 467, 474, 92 Pac. 606, it was said:

"Our constitution contemplates the complete separation of the three governmental powers *as clearly as though it so declared in express terms. . . .*" (Emphasis ours.)

In *Ruland v. City of Augusta,* 120 Kan. 42, 49, 50, 242 Pac. 456, former Chief Justice Harvey, in considering the effect of Art. 1, § 1, Art. 2, § 1, and Art. 3, § 1 of our constitution, above referred to, said:

"Commenting on these provisions, in *Western Union Tel. Co. v. Myatt,* 98 Fed. 335, 347, it was said:

" 'That, in a broad sense, the powers of one of these departments shall not be conferred upon either of the others, is not only within the true spirit of these provisions, but also substantially within the letter thereof; *and the addition thereto of an express prohibitory declaration, such as is contained in the constitutions of some of the states, that the powers of one department shall not be exercised by another, would add very little to their effect, so far as concerns the question under consideration.* The universal doctrine of American liberty under written constitutions requires the distribution of all the powers of government among three departments—legislative, judicial, and executive—and that each, within its appropriate sphere, be supreme, coordinate with, and independent of, both the others. This doctrine was adopted into the constitu-

tion of one state with the declaration that it was "to the end it may be a government of laws, and not of men"." (Emphasis ours.)

It is unnecessary to quote at length from the many decisions of this court which declare the principle above set forth. Suffice it to say the following decisions are to the same effect: *In re Sims, Petitioner*, 54 Kan. 1, 6, 11, 37 Pac. 135; *In re Davis*, 58 Kan. 368, 372, 49 Pac. 160; *In re Huron*, 58 Kan. 152, 156, 157, 48 Pac. 574; *Hicks v. Davis*, 97 Kan. 312, 315, 154 Pac. 1030; *State, ex rel., v. Robb*, 163 Kan. 503, 517, 183 P. 2d 223; *State, ex rel., v. Ancient Order of United Workmen*, 178 Kan. 69, 78, 283 P. 2d 461; *State, ex rel., v. Anderson*, 180 Kan. 120, 299 P. 2d 1078.

The separation of the powers of government represents probably the most important principle declaring and guaranteeing the liberties of the people. It is one of the chief merits of the American system of written constitutions, and, in a broad sense, the safety of our institutions depends in no small degree on the strict observance of the independence of the three departments. (11 Am. Jur. Constitutional Law, p. 880, § 182; 16 C. J. S. Constitutional Law, pp. 483, 489, §§ 104, 105.) The separation of these powers; the independence of one from the other; and, the requirements that one department shall not exercise or usurp the powers of the other two, is fundamental. Each acts, and is intended to act, as a check upon the other, and, thus, a balance system is maintained. No theory of government has been more loudly acclaimed. An excellent discussion of the importance ascribed to this principle is contained in 3 Willoughby on the Constitution, 2d ed. p. 1616, where, under the headnote "Separation of Powers," the author makes this statement:

"A fundamental principle of American constitutional jurisprudence, accepted alike in the public law of the Federal Government and of the States, is that, so far as the requirements of efficient administration will permit, the exercise of the executive, legislative, and judicial powers are to be vested in separate and independent organs of government. The value of this principle or practice in protecting the governed from arbitrary and oppressive acts on the part of those in political authority, has never been questioned since the time of autocratic royal rule in England. That the doctrine should govern the new constitutional system established in 1789 was not doubted. Washington, in his farewell address, said: 'The spirit of encroachment tends to consolidate the powers of all governments in one, and thus to create, whatever the form of government, a real despotism.' Madison, in *The Federalist*, wrote: 'The accumulation of all powers, legislative, executive, and judicial, in the same hands, whether of one, a few, or many, whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.' John Adams wrote:

'It is by balancing one of these three powers against the other two that the efforts in human nature toward tyranny can alone be checked and restrained and any degree of freedom preserved;' and Hamilton asserted: 'I agree that there is no liberty if the powers of judging be not separated from the legislative and executive powers.' Webster stated the same doctrine when he said: 'The separation of the departments [of government] so far as practicable, and the preservation of clear lines between them is the fundamental idea in the creation of all of our constitutions, and doubtless the continuance of regulated liberty depends on maintaining these boundaries.' "

The constitution of Kansas was adopted in the light of this principle of government and this court has construed it accordingly.

In *Kilbourn v. Thompson,* 103 U. S. 168, 26 L. ed. 377, paragraph 6 of the syllabus reads:

"The Constitution divides the powers of the government which it establishes into the three departments—the executive, the legislative, and the judicial—and unlimited power is conferred on no department or officer of the government. It is essential to the successful working of the system that the lines which separate those departments shall be clearly defined and closely followed, and that neither of them shall be permitted to encroach upon the powers exclusively confided to the others."

In *Myers v. United States,* 272 U. S. 52, 47 S. Ct. 21, 71 L. ed. 160, Mr. Chief Justice Taft, when referring to the debate made by James Madison in the House of Representatives in adopting the judiciary act at the First Congress, quoted Mr. Madison as follows:

" 'If there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive and Judicial powers. If there is any point in which the separation of the Legislative and Executive powers ought to be maintained with great caution, it is that which relates to officers and offices.' 1 Annals of Congress, 581."

And in the opinion it was said:

"Their union under the Confederation had not worked well, as the members of the convention knew. Montesquieu's view that the maintenance of independence as between the legislative, the executive and the judicial branches was a security for the people had their full approval. Madison in the Convention, 2 Farrand, Records of the Federal Convention, 56. *Kendall v. United States,* 12 Peters 524, 610. Accordingly, the Constitution was so framed as to vest in the Congress all legislative powers therein granted, to vest in the President the executive power, and to vest in one Supreme Court and such inferior courts as Congress might establish, the judicial power. *From this division on principle, the reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires.* Madison, 1 Annals of Congress, 497. This rule of construction has been confirmed by this Court in *Meriwether v. Garrett,* 102

U. S. 472, 515; *Kilbourn v. Thompson,* 103 U. S. 168, 190; *Mugler v. Kansas,* 123 U. S. 623, 662." (Emphasis ours.)

In *Springer v. Philippine Islands,* 277 U. S. 189, 48 S. Ct. 480, 72 L. ed. 845, Mr. Justice Sutherland said:

"Thus the Organic Act, following the rule established by the American constitutions, both state and federal, divides the government into three separate departments—the legislative, executive and judicial. Some of our state constitutions expressly provide in one form or another that the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other. Other constitutions, including that of the *United States, do not contain such an express provision. But is is implicit in all, as a conclusion logically following from the separation of the several departments.* See *Kilbourn v. Thompson,* 103 U. S. 168, 190-191. And this separation and the consequent exclusive character of the powers conferred upon each of the three departments is basic and vital—not merely a matter of governmental mechanism. . . .

"It may be stated then, as a general rule inherent in the American constitutional system, that, unless otherwise expressly provided or incidental to the powers conferred, the legislature cannot exercise either executive or judicial power; the executive cannot exercise either legislative or judicial power; the judiciary cannot exercise either executive or legislative power. The existence in the various constitutions of occasional provisions expressly giving to one of the departments powers which by their nature otherwise would fall within the general scope of the authority of another department emphasizes, rather than casts doubt upon, the generally inviolate character of this basic rule." (Emphasis ours.)

In *O'Donoghue v. United States* (1933), 289 U. S. 516, 53 S. Ct. 740, 77 L. ed. 1356, Mr. Justice Sutherland, speaking for the court in words which cannot be surpassed, said:

"The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital . . . namely, to preclude a commingling of these essentially different powers of government in the same hands. . . .

"If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not coöperate to the common end of carrying into effect the purposes of the Constitution, *but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments.* James Wilson, of one the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each department required that its proceedings *'should be free from the remotest influence, direct or indirect, of either of the other two powers.'* Andrews, The

Works of James Wilson (1896), Vol. 1, p. 367. And the importance of such independence was similarly recognized by Mr. Justice Story when he said that in reference to each other, neither of the departments *'ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers.'* 1 Story on the Constitution, 4th ed., § 530. . . ." (Emphasis ours.)

To a great extent the constitution of the state of Ohio was a model for the constitution of Kansas (*Markham v. Cornell,* 136 Kan. 884, 18 P. 2d 158). Like the constitution of Kansas, the Ohio constitution did not expressly provide that the powers of government shall be distinct and separate. In construing the Ohio constitution, the supreme court of Ohio, in *Zanesville v. Telegraph and Telephone Co.,* 64 Ohio St., 67, 59 N. E. 781, 52 L. R. A. 150, held:

"The distribution of the powers of the state, by the constitution, to the legislative, executive, and judicial departments, operates, by implication, as an inhibition against the imposition upon either, of those powers which distinctively belong to one of the other departments." (Syl. 1.)

From the authorities above set forth the reasonable construction of the constitution is: not only are the three departments distinct and separate, but that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of the other except with respect to the exercise of those powers which are expressly blended; and, the constitution should be expounded to blend them no more than it affirmatively requires. The rule may thus be stated: The distribution of the powers of the state, by the constitution, to the three departments, operates, by implication, as an inhibition against the exercise or usurpation by either of those powers which distinctively belong to one of the other departments, unless, the power sought to be exercised is expressly blended in the departments by the constitution, and no more than it affirmatively requires.

There are several expressly blended executive and legislative powers in the constitution of Kansas, some of which are:

1. Art. 1, § 3, vests supreme executive power in a governor; Art. 2, § 1, vests legislative power in a house and senate; by Art. 2, § 14, the legislature and the governor exercise coordinate functions in enacting laws, and the governor is an essential part of the legislation (*State, ex rel., v. Ryan,* 123 Kan. 767, 771, 256 Pac. 811); the governor may sign a bill, he may veto it, or a bill may become a law without his signature, or the legislature may override the governor's veto by two-thirds vote of the members elected to each house.

2. Art. 7, § 1, provides that the trustees of benevolent institutions shall be appointed by the governor by and with the advice and consent of the senate.

3. Art. 1, § 7, vests in the governor the power of pardon. (This power, by some authorities, is conceded to be judicial.)

4. Pursuant to Art. 2, § 1 and Art. 6, § 1, the legislature and the state superintendent of public instruction may coordinately exercise legislative power in altering the boundaries of school districts (*State, ex rel., v. Storey,* 144 Kan. 311, 58 P. 2d 1051).

5. Art. 1, § 2, provides that in case of a tie in the election of the members of the executive department, the legislature shall, by joint ballot, choose one of the nominees.

6. Pursuant to Art. 1, § 6, the governor may, in case of a disagreement between the two houses with respect to time of adjournment, adjourn the legislature to a future date.

7. By Art. 1, § 5, the governor may convene the legislature into special session.

8. Art. 1, § 11, provides that in case of death, impeachment, resignation, removal or other disability of the governor, the powers and duties of the office shall devolve upon the president of the senate; by Art. 1, § 12, the lieutenant governor shall be the president of the senate and shall vote only when the senate is equally divided; it further provides that the senate shall choose a president pro tempore to preside in the absence or impeachment of the lieutenant governor or when he shall hold the office of governor; by Art. 1, § 1, the lieutenant governor is a member of the executive department of the state, but the lieutenant governor is not entitled to vote on a bill or joint resolution where the senate is equally divided (*Coleman v. Miller,* 146 Kan. 390, 71 P. 2d 518).

9. By Art. 1, § 13, if the lieutenant governor, while holding the office of the governor, shall be impeached or otherwise becomes incapable of performing the duties of the office, the *president of the senate* shall act as governor until the vacancy is filled or the disability removed; if the president of the senate shall be rendered incapable of performing the duties of the office of governor, the same shall devolve upon the *speaker of the house of representatives.*

It is evident from the foregoing that the only member of the legislature who is authorized by the constitution to exercise executive power is either the president of the senate or the speaker

of the house of representatives who becomes the governor upon the occurrence of conditions set forth in Art. 1, §§ 11, 12 and 13.

Of the six members comprising the state finance council (G. S. 1955 Supp. 75-3708), four are legislative members consisting of the president pro tem of the senate, the speaker of the house of representatives, and the chairman of the committees on ways and means of the house of representatives and the senate. The only executive power the president of the senate or the speaker of the house of representatives may exercise is that set forth in Art. 1, §§ 11, 12 and 13. No provision, express or implied, is made in the constitution for the chairman of the ways and means committees of the house of representatives and the senate to exercise executive power. Consequently, under the rule above set forth, it is an inescapable conclusion that the appointment of the four legislative members to the state finance council is illegal and void, if such members exercise executive power in administering the provisions of G. S. 1955 Supp. 75-3708 to 75-3714. (*Stockman v. Leddy*, 55 Colo. 24, 129 Pac. 220; *Springer v. Philippine Islands*, supra.; *Simpson v. Hill*, 128 Okla. 269, 263 Pac. 635; *The State, ex rel. Jameson et al., v. Denny*, 118 Ind. 382, 21 N. E. 252; *State, ex rel. Black v. Burch*, 226 Ind. 445, 80 N. E. 2d 294; 11 Am. Jur., Constitutional Law, § 187, p. 886; 16 C. J. S., Constitutional Law, § 130, p. 545.)

Does the state Finance Council Act impose executive power upon the members of that council? I think it does. I shall neither explore nor delimit the frontiers of executive and legislative power, but state only my views upon the question presented by this record. The majority opinion holds that the duties imposed upon the members of the finance council are administrative in character. In this I agree. It is clear these duties are not legislative. If they were, the act would violate the constitution as a delegation of legislative power to make appropriations. It is still more clear they are not judicial. The fact they do not fall within the authority of either of these two, constitutes logical ground for concluding that they do fall within the remaining one, *i. e.*, the executive. But, it is unnecessary to reach this conclusion by deduction.

An examination of the Finance Council Act clearly demonstrates that the members of the finance council do not allocate or authorize the expenditure of the emergency fund as members of the legislature. Their duties have no real relation to the legislative power. The finance council is a part of the department of administration.

By creating the department of administration, the legislature, among other things, prescribed fiscal procedures for the budgeting, accounting, disbursing and auditing of funds appropriated to the executive department, to execute, administer and enforce statutory laws and to provide the services those laws define. In the classification of powers, the department of administration is executive and was created to assist the governor in the faithful execution of the law. Duties assigned to this department are neither legislative, nor judicial. The executive director of this department is appointed by and holds the office at the pleasure of the governor (G. S. 1955 Supp. 75-3703), and is secretary of the finance council. In carrying out the duties imposed, the finance council exercises functions similar to those of many other state boards or commissions. It executes the law by ascertaining the events and conditions upon which the law shall operate. This is an administrative duty and is a function of the executive department. Standards are provided in the statute which govern its action. The events or conditions prescribed may, or may not, occur. It may only act when the events or conditions prescribed exist. When they exist, the finance council allocates and authorizes the expenditure of funds to meet those conditions. The distinction between what the finance council does in executing the law, and what the legislature does in enacting the law, bears no semblance. The former simply ascertains the events and conditions upon which existing law operates, while the latter predetermines what the law shall be for the regulation of all future cases falling within its provisions. The former is executive, the latter is legislative. That, is the distinction.

The majority opinion states that the power to appropriate public money of the state is a legislative power. In this I am in full accord. This power is distinctly distributed to the legislative department by Art. 2 of the constitution. The legislature has the exclusive power to decide how, when and for what purpose the public funds shall be applied to execute the laws. When appropriations are made to the executive or judicial departments the legislature has no further control over the funds appropriated—its power is terminated. In *People v. Tremaine*, 252 N. Y. 27, 168 N. E. 817, Justice Pound said:

". . . The legislative power appropriates money and, except as to legislative and judicial appropriations, the administrative or executive power spends the money appropriated. Members of the legislature may not be appointed to spend the money. . . ."

Legislative power, as distinct from executive power, is the authority to make laws but not to enforce them. The latter are executive functions. The legislature may not do indirectly what it cannot do directly. It cannot create executive offices and appoint its members to such offices. In 11 Am. Jur., Constitutional Law, § 187, p. 886, the rule is stated:

"It is a fundamental principle of the American governmental system that the legislature cannot usurp the powers of the executive department by exercising functions of the latter. Thus, a state legislature may not confer purely executive power on a committee of its own members. . . ."

The rule is also stated in 16 C. J. S. Constitutional Law, § 130, pp. 545, 547, as follows:

"As a·general rule, under constitutional principles with respect to the division of powers, legislative power as distinguished from executive power is the authority to make laws, but not to enforce them."

. . . . . . . . . .

"Ordinarily, members of the legislature may not hold appointment in the administrative department of government without violating the constitutional provisions that no person charged with official duties under one of the three separate departments of government shall exercise any of the functions of another. . . . Where under the constitution the legislative power appropriates funds and, except as to legislative and judicial appropriations, the administrative or executive power expends the money so appropriated, members of the legislature cannot be appointed to expend moneys so appropriated. . . ."

In *Springer v. Philippine Islands,* supra, it was held:

"Legislative power, as distinguished from executive power, is the authority to make laws, *but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions."*
(Syl. 5.) (Emphasis ours.)

In the opinion it was stated that it was unnecessary to enlarge further upon the general subject, since it had so recently received the full consideration of the court in *Myers v. United States,* 272 U. S. 52, 47 S. Ct. 21, 71 L. ed. 160. And, further, that the legislature was without capacity to perform executive duties, directly or through its members. Also, see, *Stockman v. Leddy,* supra, where it was said:

". . . In other words, the general assembly not only passed an act— that is, made a law—but it made a joint committee of the senate and the house as its executive agent to carry out that law. This is a clear and conspicuous instance of an attempt by the general assembly to confer executive power upon a collection of its own members. . . ." (l. c. 31.)

The amended petition alleges unconstitutionality of the state Finance Council Act (G. S. 1955 Supp. 75-3708—75-3714) for the reason it violates the separation of powers distributed by the constitution, between the legislative and the executive departments. These allegations necessitate a review of the Department of Administration Act (G. S. 1955 Supp. 75-3701—75-3904) to ascertain the character of duties imposed upon the finance council.

That the designation of the four legislative members by G. S. 1955 Supp. 75-3708 to the finance council constitutes the making of an appointment to office by the legislature, cannot be seriously disputed. The positions were created and filled by the legislature; the incumbents possess governmental powers requiring the exercise of judgment and discretion; the, powers and duties of the positions are defined by the legislature; the positions are not temporary, they have permanency and continuity—for the term each member was elected to the legislature; their power is not exhausted by a single act, but is a continuing general supervisory power over a large sum of money in the emergency fund and over many policy-making functions relating to the administration of fiscal, personnel and budgetary laws; compensation and necessary expenses incurred while attending meetings are provided; and, all members are subject to the call of the chairman (the governor) at any time upon notice given in advance of all meetings. These appointments are to a station of public trust not merely transient, occasional or incidental. The powers imposed are continuing although the occasion for discharging them may be irregular and fitful. Unless the oath of a member of the legislature is sufficient, the appointees should take the constitutional oath of office (Art. 2, § 7). If all this does not amount to an appointment to an office it is hard to say what more is required.

I will not search all statutes conferring power upon the finance council, but a list would include the following from G. S. 1955 Supp.:

1. Hear and determine appeals by any state agency from final decisions or final actions of the executive director (75-3711 [2]);

2. *"With the approval of the finance council"* the executive director shall establish rules and regulations with respect to the manner of performance of any powers or duties of the department, the execution of any business of the department, and its relations to and business with other state agencies (75-3706);

3. *"When approved by the state finance council"* the personnel director shall classify all officers, employments and positions in the classified service with respect to title, specifications of duties and qualifications, including minimum qualifications, salary or wage rates and ranges for each class, grade or group of positions in the classification, which, upon approval, shall take effect immediately, and such approval shall be sent to the budget director to be used by him in the preparation of the next following and subsequent state budgets (75-2938);

4. *"Subject to the approval of the state finance council"* the controller shall adopt rules and regulations under the supervision of the executive director with respect to the administration of the old-age and survivors insurance for public employees (75-3749);

5. In the event of disagreement between the state architect and the administrative head of any state agency relating to plans, specifications and contracts for the construction, major repairs or improvements of public buildings authorized by the legislature for the use of such state agency, the executive director shall submit the matter *"to the finance council and its decision shall be final"* (75-3714);

6. To advise in the preparation of state budgets and may appoint a member or members to be present during the preparation of budget hearings, who shall receive a per diem and expenses while in attendance of such hearings (75-3711, 75-3718a);

7. State agencies may apply to the budget director to transfer a part of items appropriated to it, to other items of its appropriation. *"If the finance council approves the request"* the application shall be granted (75-3726);

8. *"With the approval of the finance council"* the controller may establish an accounting system for the settlement of transactions by state agencies on the basis of adequate expenditure vouchers approved by the controller in lieu of warrants (75-3733 [2]);

9. *"With the approval of the finance council"* the director of purchases may adopt rules and regulations relating to the administration of a purchasing division to purchase supplies, materials, equipment or contractual services for all state agencies (75-3738);

10. The executive director shall submit *"to the finance council for its approval, modification or rejection"* rules and regulations prepared by the personnel director for carrying out the Civil Service Act (75-3747);

11. The department of administration shall develop plans for improvements and economies in organization and operation of the several state agencies and install such plans as are approved by the respective heads of such agencies, or as *directed by* law or by *the governor "with the approval of the finance council"* (75-3707 [11]);

12. The department of administration shall, at the *direction of the governor "upon approval of the finance council"* provide central or consolidated services relating to stores, mail and messenger, telephones, motor pool, microfilming, duplicating, furniture exchange, building management and accounting machines (75-3707 [13]); and

13. In case of vacancies, to fill them pursuant to 75-3709.

These duties patently show that the executive power of supervision, administration and enforcement—in short, *the execution of the law*—is imposed upon the finance council, and, when performed by the legislative members, are not incidental to their legislative power in gathering information to present to the legislature for its consideration and action, rather, their *primary purpose* directs the exercise of judgment and discretion *in executing the laws enacted by the legislature.* Clearly, the authority of the governor to faithfully execute the laws enacted by the legislature is subordinated to the *"approval of the finance council."* The legislative may cooperate, investigate, study, research, recommend and enact, *but it may not execute.* That is the duty of the executive department. The inescapable result is, the legislature has attempted to confer executive power upon a "council," the majority of which is composed of its own members, and to impose upon such members duties which they were not elected to assume and which they cannot constitutionally exercise. (*Myers v. United States,* supra; *Springer v. Philippine Islands,* supra; *Zanesville v. Telephone and Telegraph Co.,* supra; *State, ex rel., v. Burch,* supra; *Stockman v. Leddy,* supra; *Simpson v. Hill,* supra.)

Like a minority stockholder with one vote at a meeting of the board of directors of a large financial institution—seen but not heard—the governor of this state, who stands as the head of the executive department as this court stands as the head of the judicial and as the legislature stands as the head of the legislative (*Householder v. Morrill,* 55 Kan. 317, 40 Pac. 664; *The State, ex rel., v. Dawson,* 86 Kan. 180, 119 Pac. 360), and who stands charged by

the constitution with the faithful execution of all laws (Art. 1, § 3), may, while in attendance of meetings of the finance council, have his policies of administration and execution thwarted, not by the supreme court or by the legislature—his co-ordinate equals in government—but, by the four legislative members of the council, who may, if a majority of them disagree with his policies of executing the laws enacted, override those policies by a majority vote and inaugurate their own. *This is veto without portfolio. This is usurpation of the executive. This is unconstitutional action.*

The most eminent constitutional authorities: the decisions of the supreme court of the United States and of this court; leaders at the convention which wrote the federal constitution: Washington, Hamilton, White and Madison; and, the writers of government: Locke, Montesquieu, Blackstone, Jefferson, Adams, Storey, Webster, Taft and Sutherland, all agree that the powers of government must be kept separate; that the acts of each shall never be controlled by or subjected directly, or indirectly, to the coercive influences of either of the other departments, and that the powers of the departments may not be blended except as affirmatively appears in the constitution. What the legislature here did was to appoint its members to a "council" and impose upon them executive power. This is an attempt to blend the powers of the legislative and executive for a purpose not affirmatively authorized by the constitution, and, hence, G. S. 1955 Supp. 75-3708 is void and unconstitutional. In my judgment, this court has failed in its responsibility to so declare.

## II.

One question remains. Do Art. 2, § 19 and Art. 15, § 1, imposing upon the legislature the duties to provide for the election or appointment of all officers, not otherwise provided for in the constitution, carry with them the power of appointment by the legislature to offices created in either the executive or judicial departments? In my judgment, they do not.

These sections, so far as here pertinent, read:

". . . It shall have the power to provide for the election or appointment of all officers, and the filling of all vacancies not otherwise provided for in this constitution." (Art. 2, § 19.)

"All officers whose election or appointment is not otherwise provided for, shall be chosen or appointed as may be prescribed by law." (Art. 15, § 1.)

Sound reasons exist to say that when these sections are considered together they authorize the legislature to *"provide for"* the

election or appointment of all officers not otherwise provided for in the constitution, "as may be prescribed by law." This seems to be clearly indicated in the language of Art. 2, § 19. However, the language of Art. 15, § 1, is not so clear but its fair import is the same or similar to the other section. It provides in substance that all officers whose election or appointment is not *otherwise* "provided for," shall be chosen or appointed as may be prescribed by law. These sections, when read together, authorize the legislature to "provide for" all officers to be elected or appointed to positions created, to execute or interpret the laws enacted. The power to provide by law the *manner* or *mode* of making an appointment does not include the power to make the appointment itself. In *The State, ex rel. Attorney General, v. Kennon et al.,* 7 Ohio St. 546, the court held:

"Directing by law the manner in which an appointment shall be made, and making an appointment, are the exercise of two different and distinct powers: the one prescribing how an act shall be done, being legislative; and the other, doing the act, being administrative." (Syl. 2.)

In a concurring opinion Justice Swan used the following language:

"Upon this question, it seems to me only necessary to refer to the plain words of the constitution. It provides, in the first place, that 'the election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by this constitution or the constitution of the United States, shall be made in such manner as may be directed by law.' Now, providing by law the manner in which an appointment shall be made, and making the appointment itself, are two different things: the first is pointing out the mode in which a thing shall be done, and the other is doing the thing itself; the one is legislative and directory, the other administrative." (l. c. 570.)

In *The State, ex rel. Jameson et al., v. Denny, Mayor,* 118 Ind. 382, 21 N. E. 252, it was said:

"We think it plain that the power to provide by law the *manner* or *mode* of making an appointment does not include the power to make the appointment itself. . . .

"In the light of the contemporaneous history of the Constitution, we do not think it will be seriously contended that the framers of that instrument intended to confer upon, or leave with, the General Assembly any such power. . . . As the right to prescribe by law the manner of appointing to a new office created by the Legislature does not carry with it the right to make such appointment, we know of no provision in the Constitution under which such right can reasonably be asserted. It is believed that this conclusion accords with the practical construction heretofore placed upon our Constitution." (l. c. 393.)

See, also, *The City of Evansville et al. v. The State, ex rel. Blend et al.*, 118 Ind. 426, 21 N. E. 267, holding to the same effect.

Furthermore, the power to appoint to office is not an intrinsic or inherent legislative power except insofar as it is an incidental power, essential to the existence of the legislative branch as an independent department of the government (*The State, ex rel. Jameson et al., v. Denny, Mayor*, supra; *The City of Evansville et al. v. The State, ex rel. Blend et al.*, supra.)

It is not sufficient to say that the legislature may appoint to the executive or judicial unless restricted by the constitution (*State, ex rel., v. Kansas Turnpike Authority*, supra). In my judgment, that is not the rule (*Stockman v. Leddy*, supra; *Springer v. Philippine Islands*, supra; *Simpson v. Hill*, supra; *State, ex rel., v. Denny*, supra; *State, ex rel., v. Burch*, supra; 11 Am. Jur., Constitutional Law, § 187, p. 886; 16 C. J. S. Constitutional Law, § 130, p. 545). The rule is: the distribution of the powers of the state, by the constitution, to the three departments, operates, by implication, as an inhibition against the exercise or usurpation by either of those powers which distinctively belong to one of the other departments, unless the power sought to be exercised is expressly blended in the departments by the constitution, and it should be expounded to blend them no more than affirmatively requires.

Unless the power sought to be exercised by the legislature is affirmatively blended by the constitution it lacks power to blend it by statute. Neither of the sections of the constitution here under consideration expressly authorize the appointment of legislative members—the blending of power—to the executive or judicial departments, hence, the power to do so does not exist (*Stockman v. Leddy*, supra; *Springer v. Philippine Islands*, supra; *Simpson v. Hill*, supra; *State, ex rel., v. Denny*, supra; *State, ex rel., v. Burch*, supra; 11 Am. Jur., Constitutional Law, § 187, p. 886; 16 C. J. S. Constitutional Law, § 130, p. 545.) Neither the executive nor the judicial would be wholly free and independent from the control, directly or indirectly, of the influence of appointees of the legislative to offices created in those departments. It needs but a suggestion to show that the combination of the executive and legislative powers may become tyranny at once (*In re Sims, Petitioner*, supra). The advancement of the science of government made in modern times is due to the separation of the three co-ordinate departments. The commingling and confusing of executive and legislative powers in

the manner here attempted is incompatible with the constitution, obnoxious to its purpose and spirit, and to the spirit of free institutions. It violates a fundamental principle of American constitutional jurisprudence and permits many powers of the executive and legislative departments to be combined and reposed in one—the legislative.

To approach the question from a different viewpoint achieves the same result. All legislative power is vested in the legislature except as restricted by the constitution. Prescribing the rules, manner and requisites of appointment or election is a legislative power (*The State v. Railway Co.*, supra; *The State v. Freeman*, 61 Kan. 90, 58 Pac. 959; *The State v. Atkin*, 64 Kan. 174, 67 Pac. 519). Where there are no express constitutional restrictions to do an act, implied inhibitions restrict and are equally potent but their existence must be equally evident. To sustain an implied inhibition there must be some express affirmative provision. This court has previously considered implied inhibition upon the legislative power. Justice Brewer prepared the opinion in *Prouty v. Stover, Lieut. Governor*, 11 Kan. 235, where it was held:

"Constitutional inhibitions need not always be express. They are equally effective when they arise by implication. To create an implied inhibition there must be some express affirmative provision. The mere silence of the constitution creates no prohibition. To sustain an implied inhibition, the express provision must apply to the exact subject-matter, and the inhibition will not be extended further than necessary to give full force to the provision." (Syl. 3.)

In *Bank v. Laughlin*, 111 Kan. 520, 207 Pac. 433, Mr. Justice Burch, in a concurring opinion, said:

". . . There must be some provision of the constitution itself which abridges legislative power. Abridgment may be express, or may be implied. One form is as potent as the other, but abridgement by implication must be as plain as express abridgement, and in order that this may be so, the implication must arise from an express provision. . . ." (l. c. 525.)

The express affirmative provisions of the constitution distributing the power of the state to three distinct and separate departments: the executive (Art. 1), the legislative (Art. 2), and the judicial (Art. 3), operates as an implied inhibition against the exercise or usurpation of either of those powers which distinctively belong to one of the other departments, unless the power sought to be exercised by the departments is expressly blended in the constitution (*Prouty v. Stover, Lieut. Governor*, supra; *In re Holcomb, Petitioner*, 21 Kan. 628; *Bank v. Laughlin*, supra; *Lemons v. Noller*, 144

Kan. 813, 63 P. 2d 177; *Wulf v. Kansas City,* 77 Kan. 358, 94 Pac. 207).

In *State, ex rel., v. Robb,* 163 Kan. 502, 183 P. 2d 223, it was said:

"The judiciary is merely one of the three branches of the state government. It should be slow to approve any action which even has the semblance of permitting one branch to act toward another in a manner contrary to the terms and provisions of the constitution."  (l. c. 517.)

No one questions the established principles that the propriety, wisdom and expediency of legislation are exclusive matters for legislative determination (*Hunt v. Eddy,* 150 Kan. 1, 90 P. 2d 747, and cases therein cited), or that our constitution limits rather than confers powers (*State, ex rel., v. Anderson,* 180 Kan. 120, 299 P. 2d 1078; *State, ex rel., v. Ancient Order of United Workmen,* 178 Kan. 69, 283 P. 2d 461), but, the constitutional restraint upon the legislative to appoint its members to offices essentially executive or judicial in character is implied from the inherent, express and insuperable barrier found in the structure of the constitution.  That the appointment of members of the legislature to positions essentially executive or judicial constitutes the exercise of power of either of those departments, cannot be seriously disputed.  Without the constitution there would be no state government; no legislative, no executive, and no judicial departments.  All departments are subject, and operate pursuant, to its command; their power comes from the people and vests where the people's constitution directs that it shall vest.  It is not created by the legislature, nor vested by that body.

This construction of the constitution does not prohibit the legislature from engaging in activities which may properly be regarded as incidental and germane to its legislative powers.  The legislature may, and has, established its own agencies.  It has created its legislative council and appointed officers from its own membership (G. S. 1949, 46-301-46-315) to collect information concerning the welfare of the state; to deal with issues of public policy and study questions of state-wide interest; to study the possibilities for consolidations of state agencies to eliminate unnecessary activities and duplications in personnel and equipment; to co-ordinate departmental activities to increase efficiency and effect economies; to study reforms for local governments; to devise means of enforcing the law; to call upon all state and local agencies to make such studies as it may require; and, it has established its own research department to assist it.  It created the judicial council (G. S. 1949, 20-2201) to survey and

study the judicial department; to devise methods of procedure to speed up litigation of the citizens of the state; to receive and consider suggestions concerning faults in the administration of justice, and, to recommend methods of simplifying civil and criminal procedure. It has the power to establish investigating committees to investigate the conduct of officers and employees of the state government (G. S. 1949, 46-108). It has its committees on claims and accounts (G. S. 1949, 46-111-46-116) to hear and consider claims against the state when the legislature is in session, and its members may be selected as a temporary committee to investigate charges of misconduct in charitable, educational or penal institutions when the legislature is not in session (G. S. 1949, 76-201-76-203). These, and other agencies, have to do with the gathering of information, of investigation, study, research and the making of recommendations to the legislature for its consideration and *enactment*. They have nothing to do with *the execution of the law*, and possess no characteristics or similarities to the the duties imposed upon the finance council.

In writing this dissent I cast no reflection whatsoever upon the legislative members of the finance council, who, beyond all doubt, are men of honor and integrity, and who have exercised the duties imposed upon them with care, with wisdom, and with sincere desire for the public welfare. No one suggests a selfish purpose. However, we are dealing with an important and far-reaching constitutional question concerning a power of government which does not permit honesty, integrity, good intentions, a progressive enthusiasm, or even successful operation to take the place of essential constitutional action.

I would enter judgment for the plaintiff. In my opinion G. S. 1955 Supp., 75-3708 is unconstitutional and void. It attempts to appoint legislative members to a "council" composed of a majority of its own members, to exercise executive power in a manner not authorized by the constitution. As this controversy indicates, the legislative purposes would be thwarted by permitting the power of allocation to remain in the governor and the lieutenant governor alone, and, in my judgment, the fund balance of the state emergency fund should be returned to the general revenue fund of the state until such time as it is appropriated to a constitutional officer or council for the use and purposes and within the limitations of G. S. 1955 Supp., 75-3713.

I am authorized to say that Mr. Justice Wertz concurs in this dissent.

SCHROEDER, J. (concurring): As to that portion of the opinion corresponding to paragraph 8 of the syllabus, I concur in the result only, since in my opinion it presents inadequate reason and authority on the special facts before this court. Concerning the other portions of the majority opinion I concur fully.

Do the provisions of the state finance council act appointing legislative members ex-officio to the council violate the fundamental principle of the separation of powers inherent in our state constitution? This question will be dealt with in two parts: (a) Do the provisions of Art. 2, § 19, and Art. 15, § 1, imposing upon the legislature the duty to provide for the election or appointment of individuals to all positions, not otherwise provided for in the constitution, carry with them the power to appoint members to positions created by the legislature in either the executive or the judicial departments?; (b) Does the separation of powers in the state constitution into legislative, executive, and judicial departments create an implied inhibition against the usurpation by one department of the powers which belong to another?

The Attorney General by this proceeding in mandamus asks that this court overrule the case of *State, ex rel., v. Kansas Turnpike Authority,* 176 Kan. 683, 692-696, 273 P. 2d 198. He argues, in effect, that the court is lifting itself by the boot straps in the Turnpike case. The court there said:

"We first note that there is no provision of our constitution with reference to the power of the legislature to provide that some one or more of its members shall be ex-officio members of a board, commission or other body created by it. That the legislature has so provided in many instances must be conceded. We are not disposed to search for all statutes where it has done so but a list would include the following from G. S. 1949:

"20-2201, creating the judicial council of which the chairmen of the judiciary committees of the house and senate are ex-officio members (no salary but are paid necessary expenses);

"46-404, creating the Kansas commission on interstate cooperation of which the five members of the senate committee on interstate cooperation and the five members of the like house committee are made members. No provision is made as to salary or expenses;

"And see 46-301 *et seq.* and 46-401 *et seq.* for other instances where members of the legislature are ex-officio members of councils or boards created;

"76-201 *et seq.*, creating a committee to investigate complaints of official misconduct for which five members of the legislature are to be appointed and

to receive the per diem and mileage they would be entitled to during the session of the legislature.

"And the following instances may be found in G. S. 1953 Supp.:

"74-4301 *et seq.*, creating the motor vehicle reciprocity commission of which the chairmen of named committees of the legislature are made ex-officio members and to receive actual expenses but no compensation for services;

"75-3601 *et seq.*, creating the state office building commission to which only members of the legislature shall be appointed, and omitting provisions as to expiration of term, they shall not be entitled to any compensation 'during any regular or special session of the legislature';

"75-3708, creating the state finance council consisting of six members including the president *pro tem* of the senate, the speaker of the house and the chairmen of the ways and means committees of the senate and the house, who shall be compensated for time spent in attendance at meetings at the rate of twenty dollars per day and actual traveling and necessary expenses in attending meetings.

. . . . . . . . . . . . . . .

"It has been repeatedly held that questions of public policy are for legislative and not judicial determination, and where the legislature does so declare, and there is no constitutional impediment, the question of the wisdom, justice or expediency of the legislation is for that body and not for the courts (see West's Kan. Dig., Const. L. § 70 (3) and Hatcher's Kan. Dig., Const., L. § 31).

"The State's contention that the act constitutes an unauthorized attempt to confer executive power upon members of the legislature is not extended further than to the appointment of two of its committee chairmen as ex-officio members of the Authority. While the legislature cannot interfere with nor exercise any powers properly belonging to the executive, it may engage in activities which may properly be regarded as incidental to and within the scope of its legislative duties, and it is not an encroachment on the executive for the legislature to create a commission and to designate its members to perform delegable legislative duties. See 16 C. J. S. pg. 332, *et seq.* [Particularly, Constitutional Law, §§ 97 to 100 incl., pp. 344-469.] A power of appointment is not an exclusive function of the executive, nor has it ever been so considered. The above statutes and many others that could be cited demonstrate it has not been so considered, and if it were fully so this court would be without authority to appoint its own clerk and reporter. Insofar as the State's argument that the salary of a legislator is increased beyond constitutional limitations is concerned, it is observed that the compensation paid is not connected with any duty those named persons have as members of the legislature, but is for the performance of administrative duties as members of the Authority.

"We are of the opinion the contention made under this heading cannot be sustained."

This court after having given full consideration to this question, which was decided by a unanimous court as then constituted, the decision of which was announced on July 24, 1954, is now requested in substance to break faith and do an about face.

The doctrine of *stare decisis* is a well-established general rule that

when a principle of law has become settled by decision, it forms a precedent which is not afterwards to be departed from. This rule is based on expediency and public policy, and although generally it should be strictly adhered to by the courts, it is not universally applicable. It is, however, indispensable to the due administration of justice, especially by a court of last resort, that a question once deliberately examined and decided should be considered as settled and closed to further argument. (21 C. J. S., Courts, § 187, pp. 302 and 303.)

On October 14, 1954, by force of the constitutionality of the Turnpike Act $160,000,000.00 in bonds, the principal amount of the turnpike revenue bonds, were sold and delivered to Smith, Barney & Company and The First Boston Corporation. These bonds then found their way to the investing public in all parts of the country. The proceeds were applied to the construction of the Kansas Turnpike and its operation. (Kansas Turnpike Authority—Third Annual Report, 1955, pp. 8 and 9.) If the doctrine of *stare decisis* has force, it should be applied with greater force under the circumstances now present.

In the case now before the court the same identical question is presented relative to the designation of legislative members to serve ex-officio on the state finance council which the legislature created by enactment.

The first question considered is: Do the provisions of Art. 2, § 19, and Art. 15, § 1, imposing upon the legislature the duties to provide for the election or appointment of individuals to all positions, not otherwise provided for in the constitution, carry with them the power to appoint members to positions created by the legislature in either the executive or the judicial departments?

These sections so far as here applicable, read:

". . . It shall have the power to provide for the election or appointment of all officers, and the filling of all vacancies not otherwise provided for in this constitution." (Art. 2, § 19.)

"All officers whose election or appointment is not otherwise provided for, shall be chosen or appointed as may be prescribed by law." (Art. 15, § 1.)

The constitution of the state of Kansas limits rather than confers power, and where a statute is attacked as unconstitutional the question to be determined is not whether its provisions are authorized by the constitution, but whether they are prohibited by it. (*Lemons v. Noller*, 144 Kan. 813, 63 P. 2d 177; *State, ex rel., v. Ancient Order*

*of United Workmen,* 178 Kan. 69, 283 P. 2d 461; *State, ex rel., v. Anderson,* 180 Kan. 120, 299 P. 2d 1078.)

The long and well-established rules of this jurisdiction relative to the presumption of constitutionality of a statute and rules of construction are succinctly set forth in the majority opinion. To unduly burden this opinion by repetition would serve no purpose. These rules are fully applicable to the questions discussed herein and specific reference is made to them. (*Hunt v. Eddy,* 150 Kan. 1, 4, 90 P. 2d 747; *Carolene Products Co. v. Mohler,* 152 Kan. 2, 102 P. 2d 1044; *Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530; *State, ex rel., v. Board of Regents,* 167 Kan. 587, 207 P. 2d 373; *Marks v. Frantz,* 179 Kan. 638, 298 P. 2d 316; *State, ex rel., v. Board of Education,* 137 Kan. 451, 455, 21 P. 2d 295; *State, ex rel., v. State Highway Comm.,* 163 Kan. 187, 182 P. 2d 127.)

There is no *express* provision of the constitution which restricts or limits the power of the legislature to appoint its members to boards or commissions created by legislative enactment. Then, is there a restriction or limit *implied* from the inherent provisions of the constitution which provides for three distinct and separate departments of government—legislative, executive and judicial? To create by implication an inhibition there must be some express affirmative provision. The mere silence of the constitution creates no prohibition. To sustain an implied inhibition, the express provision must apply to the exact subject matter. (*Prouty v. Stover, Lieut. Governor,* 11 Kan. 235; *Lemons v. Noller,* supra.) An implied prohibition is as potent as an express inhibition, but it must be as plain as an express inhibition, and in order that it may be so, the implication must arise from an express provision. (*Bank v. Laughlin,* 111 Kan. 520, 207 Pac. 433.)

A power of appointment is not an exclusive function of the executive department, nor has it ever been so considered. (*State, ex rel., v. Kansas Turnpike Authority,* supra.) If there existed in the provisions of Art. 2, § 19, and Art. 15, § 1, an implied inhibition that the legislature could not appoint members to a board or commission of its own creation, then obviously it could not even appoint members to a board or commission created by its own enactment to perform strictly legislative duties and functions, whether temporary or permanent. No implied inhibition arises from these sections of the constitution alone. This question is not controverted.

Once the true meaning of Art. 2, § 19, and Art. 15, § 1, considered

separate and apart, crystalizes, it follows that an inhibition of the legislature to appoint members to boards or commissions created by the legislature in either the executive or judicial departments must be implied strictly from the inherent separation of powers of the three departments of government in our constitution.

Further consideration of this point leads to a discussion of the next point.

Does the separation of powers in the state constitution into legislative, executive, and judicial departments create an implied inhibition against the usurpation by one department of the powers which belong to another?

The language as generally used in cases involving a constitutional question is prone to waive in terms of broad generalities which are hard to pinpoint to the application of facts until such time as the writer of the opinion comes to the conclusion that the matter before the court is or is not constitutional.

It is neither difficult by continued repetition of constitutional theory, as expressed in relation to other facts before a particular court, to conjure in the mind of the reader an impression of facts which do not exist, nor is it difficult to present other facts and circumstances as hypothetical fodder for argument. One should not be overcome by the repetition of theory piled higher and higher in matters concerning the separation of powers before the facts and practical aspects of the problem have been thoroughly exploited by judicial thought.

Presently before the court is a specific set of facts and circumstances definitely limited and very narrow in scope concerning which a constitutional attack is made. Of importance to this action in mandamus is whether the state treasurer and controller should be compelled to transfer all moneys in the state emergency fund to the general revenue fund in the state treasury. It is limited to the specific enactments involving this fund and *its administration* by the state finance council. Constitutions and enactments of other states or general statements of law based upon facts, circumstances and statutes dissimilar to the precise case before us are misleading and immaterial.

Material to this discussion are only a few specific statutes. They are: G. S. 1955 Supp., 75-3708, creating the state finance council; G. S. 1955 Supp., 75-3711, prescribing the powers and duties of the

state finance council and specifically setting forth in Subsection 4 thereof:

"Make allocations to, and approve expenditures by a state agency, from any appropriations to the finance council for that purpose, of funds for unanticipated and unbudgeted needs, under conditions and limitations prescribed by the legislature";

G. S. 1955 Supp., 75-3712, providing as follows:

"The state emergency fund created by section 74-4105 of the General Statutes of 1949 is hereby continued in the office of the treasurer of state for the use of the state finance council created by section 8 [75-3708] of this act for the purposes and within the limitations prescribed by sections 13 [75-3713] and 14 [75-3714] of this act.";

and G. S. 1955 Supp., 75-3713, providing for the allocation to, and expenditure of funds by, state agencies from the state emergency fund ·in case of *emergency and extraordinary circumstance.* It *must be emphasized* that the duties and functions of the state finance council beyond the administration of the provisions of G. S. 1955 Supp., 75-3713, are not presently before the court. For the specific point now under consideration, let us examine the structure in the state finance council.

Its organizational structure, found in G. S. 1955 Supp., 75-3708, consists of six members, the members of which shall be (1) the Governor, (2) the Lieutenant Governor, (3) the President Pro Tem of the Senate, (4) the Speaker of the House of Representatives, (5) the Chairman of the Senate Committee on Ways and Means, and (6) the Chairman of the House of Representatives Committee on Ways and Means. The act specifically provides that the *governor* shall be the *chairman* and the executive director shall be the secretary of the council but shall not be a member of such council.

The provisions of G. S. 1955 Supp., 75-3713, provide among other things that the state finance council *by unanimous vote of all its members* is authorized and empowered to make allocations to, and authorize expenditures by, state agencies from the state emergency fund for the specific purposes ·specified, they being enumerated conditions of *emergency and extraordinary circumstance.* It is readily apparent from the foregoing that the chief executive of the state, the governor, has a *negative power of control* over the state finance council as well as do each of the other members by reason of the veto provision in the act itself which authorizes expenditures from the state emergency fund. The chief

executive of the state likewise by the provisions of the enactment (G. S. 1955 Supp., 75-3708) here under consideration has a *positive control* over the state finance council by reason of the fact that he is made the chairman. Thus, in its legislative wisdom the law making body has specifically taken the precaution to provide the organizational structure for the state finance council and proscribe its limitations.

An analogous situation exists under the laws governing the United Nations. By provisions of the Charter of the United Nations, Chapter 5, Article 23, Section 1, the security council is made up of eleven members of the United Nations. Of those eleven members, five members are permanent members of the security council. Then by the provisions of Chapter 5, Article 27, Section 3, decisions of the security council on all matters other than procedural shall be made by an affirmative vote of seven members including the *concurring votes of all the permanent members.* This is the famous provision which grants to any one of the five permanent members the right of veto. No one of these permanent member nations on the security council has contended that their rights of sovereignty have been surrendered by reason of their participation in the United Nations as a subscribing member, and no case has been found on the constitutional question in the Supreme Court of the United States indicating that the sovereignty of the United States has been jeopardized or surrendered by reason of its participation as a member nation, it being one of the permanent members of the security council. In fact, by the provisions of the Charter of the United Nations, Chapter 1, Article 2, Section 1, the organization of the United Nations is based on the principle of the sovereign equality of all its members.

There is little difficulty in concluding that the members of the state finance council operate and function as individual members of an administrative body in the performance of administrative duties. As individuals, they must cooperate with each other in this administrative capacity to function as a state finance council at all. When they cease to cooperate they cease to function for the simple reason that any member has a power of veto. Likewise, four members of the state finance council being ex-officio legislative members, it cannot be overlooked as a practical matter that as between the legislative and the executive departments of our government the enactment contemplates comity and coopera-

tion and not a blending of powers. When either of these attributes of the enactment under consideration, that is, comity and cooperation as between the two departments or cooperation among the individual members serving on the state finance council, break down, the state finance council ceases to function concerning expenditure for matters of *emergency and extraordinary circumstance* confronting our state government. The governor confronted with an emergency in such event, if the legislature is not in session and necessity requires, must convene the legislature pursuant to his powers under the provisions of Art. 1, § 5, of the constitution.

There is no quarrel with the law that the constitution of Kansas creates three distinct and separate departments—the legislative, the executive, and the judicial. In this respect, our state constitution is the same as our federal constitution. In *O'Donoghue v. United States* (1933), 289 U. S. 516, 53 S. Ct. 740, 77 L. Ed. 1356, Justice Sutherland speaking for the court said:

"The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, . . . namely, to preclude a commingling of these essentially different powers of government in the same hands. . . .

"If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, *but in the sense that the acts of each shall never be controlled by, or subjected directly or indirectly, to, the coercive influence of either of the other departments. . . .*" (Emphasis added)

See also: 11 Am. Jur., Constitutional Law, § 187, p. 886; and 16 C. J. S., Constitutional Law, § 130, pp. 545-547.

On the facts before this court we are confronted quite definitely with a cooperative proposition on matters of *emergency and extraordinary circumstance,* and not one which consists of the usurpation of power by the legislature over the executive or vice versa. At no place in the enactments under consideration is one department of the government subjected directly or indirectly to the coercive influence of the other. It was aptly said by Justice Sutherland in the foregoing quoted portion of the opinion that the independence of the departments in government does not mean

independent in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the constitution.

It is significant to point out that the portion of the state finance council act presently before the court does not consist of an effort on the part of the legislature to create an agency of the state made up of a collection of its own members only as was true in the case of *Stockman v. Leddy*, 55 Colo. 24, 129 Pac. 220. The authority and duty of the governor of the state to faithfully execute the laws enacted by the legislature is not in any way infringed by the state finance council enactment insofar as the question is now before this court.

Under all the facts and circumstances here considered the legislature has seen fit to set up a cooperative plan in the public interest and the wisdom of such plan is not for the judiciary to pass upon but only to determine whether the enactment complies with the requisite constitutional safeguards. (*Noel v. Menninger Foundation*, 175 Kan. 751, 267 P. 2d 934; *McAllister v. Fair*, 72 Kan. 533, 84 Pac. 112; 115 Am. St. Rep. 233; 3 L. R. A. n. s. 726; see West's Kan. Dig., Constitutional Law, § 70 [3] and Hatcher's Kan. Dig., Constitutional Law, § 31.) It is true that the legislative department of our government may not operate in the executive department to execute laws, but it is clear that the legislative department may cooperate, investigate, study, research, recommend and enact laws. The specific enactments, as limited by the scope of this action, challenged before this court fall in the realm of *cooperation* on the part of the legislature and do not attempt to usurp functions of the executive department of the government.

The statutory enactments under constitutional attack, when construed in accordance with the rules set out in *Hunt v. Eddy*, supra, and the cases following as herein cited, clearly indicate no violation of the separation of powers inherent in our state constitution, there being no usurpation by one department of the powers of the other on the specific facts and circumstances presented in this action.

Under such conditions it follows that no inhibition may be implied to prevent the legislature from appointing its members ex-officio to the state finance council by enactment. The legislature may engage in activities which may properly be regarded as incidental to and within the scope of its legislative duties. (*State, ex rel., v. Kansas Turnpike Authority*, supra).

PARKER, C. J., and PRICE, J., join in the foregoing concurring opinion.

ROBB, J. (concurring specially): I find myself unable to agree completely with either the court's opinion or the dissenting opinion. My purpose in concurring specially in the majority opinion is that I believe some additional discussion may be helpful and I wish to emphasize statements of some of the authorities that I consider appropriate on the particular constitutional problem presented by this case.

I would be inclined to join in the dissent were it not for that long line of decisions of our court following the almost universal rule that an act of the legislature is presumed to be constitutional unless it contravenes an express inhibition of the constitution or one necessarily implied from some express affirmative provision of that instrument. (*State, ex rel., v. Ancient Order of United Workmen,* 178 Kan. 69, 78, 283 P. 2d 461.) For additional Kansas cases on this subject see, also, *State, ex rel., v. Board of Education,* 137 Kan. 451, 453, 21 P. 2d 295; *Thompson v. Reno County Comm'rs,* 152 Kan. 610, 106 P. 2d 700; *Miller v. Jackson,* 166 Kan. 141, 143, 199 P. 2d 513, *Mizer v. Kansas Bostwick Irrigation District,* 172 Kan. 157, 175, 239 P. 2d 370; 1 Hatcher's Kansas Digest, rev. ed., Constitutional Law, §§ 15, 16, pp. 610, 611, and 1956 Cum. Supp. §§ 15, 16, pp. 56, 57; 3A West's Kansas Digest, Constitutional Law, § 48, p. 23, et seq.) The foregoing are not by any means all of our cases on this subject.

In the majority opinion reference is made to *State, ex rel., v. Kansas Turnpike Authority,* 176 Kan. 683, 273 P. 2d 198, and to the fact that some of the members of the Authority are also members of the legislature and serve on the Authority with compensation. In this specially concurring opinion I am not considering any analogy between that case and our present one. However, I do not favor an unlimited creation of boards and commissions with the members of the legislature constituting the paid personnel thereof.

It is elementary that the government of Kansas is conferred upon three coordinate departments—the legislative, the executive, and the judicial. Each is supreme within its own sphere, subject only to our constitutional limitations. (*Hicks v. Davis,* 97 Kan. 312, 314, 154 Pac. 1030; *State, ex rel., v. Ancient Order of United Work-*

*men,* supra, p. 78.) The question to be considered is not whether our constitution authorizes an act but whether it is prohibited thereby. Our constitution limits rather than confers powers. (*State, ex rel., v. Anderson,* 180 Kan. 120, 125, 299 P. 2d 1078.)

All political power is vested and inherent in the people under our federal constitution and under section 2 of the bill of rights of our state constitution (*Marks v. Frantz,* 179 Kan. 638, 650, 298 P. 2d 316) and this fact should always be remembered by those placed in the three branches of our government by the people. The legislature enacts, amends and repeals laws; the executive administers those laws; and the judiciary interprets and enforces them. On some occasions the judiciary has used its power of judicial review to reverse a former interpretation and, as an ultimate proposition, the people have from time to time seen fit to amend the constitution. These are all a part of our orderly processes of government.

As the legislature cannot ordinarily diminish, enlarge, or interfere with the jurisdiction of a court (*Wyandotte County Comm'rs v. General Securities Corp.,* 157 Kan. 64, 75, 138 P. 2d 479) it likewise cannot so affect the jurisdiction of the executive. It must be generally recognized that such an effort would be a contravention of its powers which are limited by the constitution.

The fact that an unconstitutional statute enacted by legislative authority remains in our statutes indefinitely without challenge does not impart legality to a subsequently-enacted statute with the same, or similar, infirmity, nor does this relieve a court of its duty to determine the constitutionality of the subsequent enactment if and when such question is properly presented for determination, as was substantially stated in the Wyandotte County Comm'rs case at page 79. We are not governed in this case by the fact that other boards and commissions have been established by previous legislative enactment whereby provision was also made for members of the legislature to serve thereon and the constitutionality of such previous legislative enactments has not been properly contested and determined.

Our state constitution was modeled after that of Ohio and the case of *Zanesville v. Telegraph and Telephone Co.,* 64 Ohio St., 67, 59 N. E. 781, 52 L. R. A. 150, is cited in the dissent as pertinent on the point of separation of powers. There the legislature delegated power to the probate court to make final determination

of problems respecting the installation of poles, etc., of the defendant telephone company in the city of Zanesville when the company and the city council were unable to agree. The court held the function there involved was one of a judicial character rather than legislative and thereby determined the act to be constitutional. In that opinion the Ohio Supreme Court said:

"The legislature, by conferring any particular power upon a court, virtually declares that it considers it a power which may be most appropriately exercised under the modes and forms of judicial proceedings. . . ," (p. 84)

and later stated,

"The administration of that remedy . . . consists of an order made by the court in the usual manner of legal proceedings, after a hearing of the allegations and evidence of parties who are brought before the court by proper process. . . ," (p. 89)

and finally, as a result of consideration of the propriety or constitutionality of the enactment, the court concluded,

"The argument [that it was not constitutional] to the contrary . . . at most has served to cast a doubt upon the validity of the provision, but that is not enough to justify the court in holding it unconstitutional. . . ." (p. 91.)

To avoid unduly lengthening this opinion, I will not go into other facets of this Ohio case but it is a well-reasoned and well-developed opinion. It was cited in a dissenting opinion in *Cleveland v. Pub. Util. Comm.*, 102 Ohio St., 341, 358, 359, 131 N. E. 714, in support of the rule on distribution of powers as previously stated herein, and it was again cited in *Local Tel. Co. v. Mutl. Tel. Co.*, 102 Ohio St., 524, 552, 133 N. E. 527.

A later Ohio *per curiam* opinion (*In re Bostwick*, 125 Ohio St., 182, 180 N. E. 713) involved the removal of a judge who contended that the removal of a public officer presented a political question and not a judicial one, which contention was not upheld by the court. The court there quoted from the City of Zanesville case, supra, Syl. ¶ 2, as follows:

"The fact that a power is conferred by statute on a court of justice, to be exercised by it in the first instance in a proceeding instituted therein, is, itself, of controlling importance as fixing the judicial character of the power, and is decisive in that respect unless it is reasonably certain that the power belongs exclusively to the legislative or executive department. (p. 183.)

In a later Ohio case (*Bogen v. Clemmer*, 125 Ohio St., 186, 180

N. E. 710), which I believe displays a more modern trend of thinking and may give some light to our discussion, we find the following language:

"Where a power is *quasi* legislative, or *quasi* administrative, or *quasi* judicial, or a combination of all of them, the Legislature may, where such twilight zone of distinction applies, characterize the power and confer it upon any agency it selects or creates for the purpose. [Citations.]

"It might be said, in passing, that it always has been and always will be the policy of our government, national and state, to keep distinct and separate our legislative, judicial and executive departments of government, so that each may operate as a check and balance upon the other; but government would prove abortive if it were attempted to follow such policy to the letter. State agencies and public officials, regardless of classification, could not function if this rule were strictly followed, particularly in the exercise of the police power of the state." (p. 189.)

Thus I conclude, as did the Ohio court, that we cannot waive our constitutional provisions on the theory that even the constitution must bend to the public good.

I think it is evident that the governor's power is not limited. He may call the legislature together in a special session or he may, as chairman, call the members of the finance council to meet. (G. S. Supp. 75-3708; 75-3710.)